No. 23-1439

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE,

v.

JAREN MICHAEL STENNERSON
DEFENDANT-APPELLANT.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
D.C. NO. CR-22-139-BLG-SPW

———————————

ANSWERING BRIEF OF THE UNITED STATES

———————————


JESSE A. LASLOVICH                    TIMOTHY A. TATARKA
United States Attorney                Assistant U.S. Attorney
                                      District of Montana
                                      2601 2nd Avenue North
                                      Suite 3200
                                      Billings, MT 59101
                                      Telephone: (406) 657-6101

                                      Attorneys for Appellee

# TABLE OF CONTENTS

Table of Contents ...................................................................i

Table of Authorities ............................................................iv

Introduction.........................................................................1

Statement of Jurisdiction ....................................................3

Statement of the Issues .......................................................3

    I.  Whether 18 U.S.C. § 922(g)(3), which bars
        possession of firearms by unlawful drug users, is
        unconstitutional under the Second Amendment on
        its face.........................................................................3

    II.  Whether 18 U.S.C. § 922(n), which bars receipt of
        firearms by those under felony indictment, is
        unconstitutional under the Second Amendment on
        its face.........................................................................3

    III.Whether 18 U.S.C. § 922(g)(3) is unconstitutionally
        vague as applied to Stennerson, who admitted
        using a "shot" a day of methamphetamine, and
        whether Ninth Circuit precedent forecloses a facial
        challenge to the statute. ............................................3

Statement of the Case.........................................................3

Statement Regarding Oral Argument ..................................4

Statement of Facts ...............................................................4

    I.  Stennerson, an admitted methamphetamine addict,
        engages in a series of crimes related to his drug
        addiction. ....................................................................4

    II.  Stennerson is caught with a firearm and is indicted
        for possession of firearm by an illegal drug user

and receipt of a firearm while under felony indictment. ...................................................... 6

III. The district court denies Stennerson's motion to dismiss the indictment, accepts his guilty pleas, and sentences Stennerson to 21 months imprisonment. ............................................... 7

Summary of Argument .................................... 9

Argument ...................................................... 11

I. Stennerson cannot show the United States' prohibition on possession of a firearm by an unlawful user of a controlled substance is unconstitutional. ............................................ 11

A. Section 922(g)(3) is Constitutional Under the Precedents of Both the Supreme Court and this Court . ................................................... 11

B. Even if *Bruen* Had Abrogated this Court's Precedent, Stennerson Cannot Show that 18 U.S.C. § 922(g)(3) Is Facially Unconstitutional. ................. 22

II. Stennerson cannot show the United States' prohibition on receipt of a firearm by a person under felony indictment is unconstitutional. .......................... 58

A. The Nation has a well-established history of liberty restrictions on those pending trial for serious criminal offenses. .................................... 59

B. Section 922(n) does not burden the right of law-abiding, responsible citizens to keep and bear arms. 62

C. Section 922(n) is consistent with the Nation's historical tradition of gun regulation. ................. 64

III. Section 922(g)(3) is not unconstitutionally vague. ................. 68

ii

Conclusion ............................................................................... 71

Statement of Related Cases .................................................... 73

Certificate of Compliance ....................................................... 74

Certificate of Service .............................................................. 75

# TABLE OF AUTHORITIES

<u>Cases</u>

*Barrett v. United States,*
423 U.S. 212 (1976) ................................................................ 47

*Beck v. Ohio,*
379 U.S. 89 (1964) ................................................................. 60

*Bell v. Wolfish,*
441 U.S. 540 (1979) .......................................................... 61, 62

*Carlson v. Landon,*
342 U.S. 524 (1952) ...................................................... 59, 60, 64

*County of Riverside v. McLaughlin, .*
500 U.S. 44 (1991) ................................................................. 61

*Dickerson v. New Banner Institute, Inc.,*
460 U.S. 103 (1983) ............................................................... 46

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................................
.......... 12, 13, 15, 17, 18, 20, 21, 23, 25, 26, 31, 32, 34, 35, 37, 52, 63

*Florence v. Bd. of Chosen Freeholders,*
415 U.S. 814 (1974) ............................................................... 60

*Huddleston v. United States,*
415 U.S. 814 (1974) ............................................................... 48

*Johnson v. United States,*
576 U.S. 591 (2015) .......................................................... 69, 70

*Kaley v. United States,*
571 U.S. 320 (2014) ...................................................... 61, 65, 66

*Lewis v. United States,*
445 U.S. 55 (1980) ................................................................. 47

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010) ............................................................. 13, 23, 25

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) ............................................................. 22

*New York State Rifle & Pistol Assoc., Inc. v. Bruen,*
    142 S.Ct. 2111 (2022) .............................................................................
    2, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 29, 39, 42, 49, 50, 51,
    53, 54, 57, 61, 63, 66

*Patterson v. Winn,*
    5 Pet. 233 (1831) ............................................................................. 40

*Scarborough v. United States,*
    431 U.S. 563 (1977) ........................................................................ 49

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) ................................................................ 69, 70

*State v. Hogan,*
    58 N.E. 572 (1900) ......................................................................... 46

*State v. Shelby,*
    2 S.W. 468 (1886) ........................................................................... 46

*United States v. Alaniz,*
    69 F.4th 1124 (9th Cir. 2023)...................... 23, 24, 25, 26, 49, 55, 56

*United States v. Alston,*
    No. 5:23-CR-021, 2023 WL 4758734 (E.D.N.C. July 18, 2023) ..........
    ..................................................................................... 59, 62, 66

*United States v. Butts,*
    No. 23-313 ...................................................................................... 20

*United States v. Chovan,*
    735 F.3d 1127 (9th Cir. 2013) ......................................................... 20

*United States v. Cook,*
    970 F.3d 866 (7th Cir. 2020) ..................................................... 70, 71

*United States v. Davis,*
139 S. Ct. 2319 (2019) .................................................................... 70

*United States v. Duarte,*
No. 22-50048 .................................................................................. 20

*United States v. Dugan,*
657 F.3d 998 (9th Cir. 2011) ... 1, 2, 14, 15, 17, 19, 20, 21, 22, 48, 50, 51, 53, 58

*United States v. Fencl,*
No. 21-CR-3101, JLS, 2022 WL 17486363 (S.D. Cal. Dec. 7, 2022), *aff'd* No. 22-50316 (9th Cir. Jan 26, 2023) ................................. 63, 64

*United States v. Hasson,*
26 F.4th 610 (4th Cir. 2022)........................................................... 70

*United States v. Howard,*
No. 22-10211 .................................................................................. 20

*United States v. Jackson,*
69 F.4th 495 (8th Cir. 2023)..................................................... 53, 57

*United States v. Kelly*,
No. 3:22-CR-37, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) .. 55

*United States v. Khatib,*
No. 12-CR-190, 2012 WL 6086862 (E.D. Wis. Dec. 6, 2012) .......... 68

*United States v. Laurent,*
861 F. Supp. 2d 71 (E.D.N.Y. 2011)............................................... 67

*United States v. Martinez,*
No. 23-1125 .................................................................................... 20

*United States v. Ocegueda,*
564 F.2d 1363 (9th Cir. 1977) ....................................................... 68

*United States v. Okello,*
__ F.Supp.3d __, 2023 WL 551828 (D.S.D. Aug. 23, 2023) ....... 32, 33

*United States v. Purdy*
264 F.3d 809 (9th Cir. 2001)) .................................... 1, 50, 68, 70, 71

*United States v. Quiroz,*
629 F. Supp. 3d 511 (W.D. Tex. 2022) ............................ 62

*United States v. Rahimi,*
No. 22-915 ........................................................ 25

*United States v. Registe,*
No. 20-30042 ..................................................... 20

*United States v. Robinson,*
414 U.S. 218 (1973) .............................................. 60

*United States v. Rojo,*
No. 23-598 ....................................................... 20

*United States v. Salerno,*
481 U.S. 739 (1987) .................................... 11, 22, 60, 61, 64

*United States v. Skoien,*
614 F.3d 638 (7th Cir. 2010) ..................................... 52

*United States v. Stephens,*
594 F.3d 1033 (8th Cir. 2010) .................................... 65

*United States v. Turner,*
842 F.3d 602 (8th Cir. 2016) ..................................... 69

*United States v. Watson,*
423 U.S. 411 (1976) .............................................. 60

*United States v. Yancy,*
621 F.3d 681 (7th Cir. 2010) ............................ 21, 45, 48, 50, 52, 55

*United States v.Vongxay,*
594 F.3d 1111 (9th Cir. 2010) .......... 11, 13, 14, 15, 16, 17, 20, 21, 22

## Statutes

18 U.S.C. § 3231 .................................................. 3

18 U.S.C. § 922(g)(1) ............................................................. 13

18 U.S.C. § 922(g)(3) ............... 3, 7, 8, 15, 19, 20, 22, 25, 32, 47, 49, 68

18 U.S.C. § 922(g)(8) ............................................................. 25

18 U.S.C. § 922(n) ................................... 3, 7, 58, 62, 63, 66, 67

21 U.S.C. § 802(1) ............................................................... 48

21 U.S.C. § 844 .................................................................. 49

28 U.S.C. § 1291 ................................................................... 3

## Other Authorities

1 Mo. Rev. Stat. ch. 24, Art. II, § 1274 (1879) .............................. 43, 44

1 *The Remembrancer; or Impartial Repository of Public Events, for the Year 1781* (1780)................................................................... 31

1 Richard Burn, The Justice of the Peace, and Parish Officer (2d ed. 1756)................................................................................ 29

1 William Hawkins, A Treatise of the Pleas of the Crown (1716).....29

2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976)................... 34

2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780* (1780)........................................................... 30

4 *Journals of the Continental Congress 1774-1789* (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776) ...................................... 39

4 William Blackstone, Commentaries on the Laws of England (10th ed. 1787)........................................................................... 29

4 William Blackstone, Commentaries on the Laws of England 296 . 59

5 Colonial Laws of New York 244-46 (1894)....................................... 32

6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) ......................................................................... 34

21 *The Parliamentary History of England, from The Earliest Period to the Year 1803* (T.C. Hansard 1814) .............................................. 30

42 The Scots Magazine 419 (Aug. 1780) ............................................. 30

49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780) ...................................................................................... 30

1916 N.J. Laws 275-76, ch. 130, §§ 1-2 ............................................. 44

1935 S.D. Sess. Laws ch. 208, § 8, 356 ............................................... 45

1938 Federal Firearms Act, 5 Cong. Ch. 850, § 2(e) ........................... 62

Act of 1776, 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862) ............................................................................................................ 40

Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* (Walter Clark ed., 1905) ................................................................... 39

Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221 ........................... 43

Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts & Resolves 157 ...... 43

Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73 ........................................ 42

Act of Apr. 24, 1880, ch. 257, § 4, 1880 Mass. Acts 232 .................... 43

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wis. Sess. Laws, Vol. 1 .......... 43

Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1 .......... 44

Act of Apr. 30, 1855, §§ 1-2, in 2 *The General Laws of the State of California, from 1850 to 1864* (Theodore H. Hitchell ed., 1865) .... 44

Act of Apr. 30, 1879, § 2, 1879 Pa. Laws 34 ...................................... 43

Act of Apr. 6, 1936, No. 82, § 1936 Ala. Laws 52 ............................... 45

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716 (1881) ................ 42

Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves 110 ....... 44

Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170 ........................ 43

Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* (Charles J. Hoadly ed., 1890)................................................................................................ 39

Act of Dec. 6, 1783, ch. 1059, § 1, 11 *The Statutes at Large of Pennsylvania from 1682 to 1801* (1906) .......................................... 41

Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts 13-14 ................... 43

Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special Statutes of the Commonwealth of Massachusetts* 145-147 (1805) .......................... 40

Act of Feb. 17, 1876, No. 128, § 1, 1876 Ga. Laws 112 ...................... 42

Act of Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21 ........... 43

Act of Feb. 18, 1794, § 1, *The Laws of the State of New Hampshire* 460 (1815) ........................................................................................ 41

Act of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17 ............................ 42

Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25 ............... 44

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92 ........................ 43

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 .......................... 43

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ................ 43, 44

Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws 87 ...... 42, 43

Act of June 14, 1701, ch. 7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed., 1904) ........................................................ 41

Act of July 1, 1890, No. 46, § 1, 1890 La. Acts 39 .............................. 43

Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.) ........................ 42

x

Act of July 8, 1932, ch. 465, § 7, 47 Stat. 650 (D.C.) ......................... 45

Act of June 10, 1881, § 1, 1881 Pa. Laws 111-112.............................. 43

Act of June 12, 1879, § 2, 1879 Ohio Laws 192 .................................. 43

Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144 ............. 43

Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120 (1890).............. 41

Act of Mar. 12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355........... 43

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Territory Sess. Laws
    140 ................................................................................................. 43

Act of Mar. 15, 1788, ch. 81, §1, 2 *Laws of the State of New-York*, 95-
    96 (2d ed. 1807).............................................................................. 41

Act of Mar. 2, 1885, ch. 51, § 1, 1885 Nev. Stat. 51........................... 43

Act of Mar. 25, 1880, § 1, 1880 Ohio Laws 79-80 .............................. 43

Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879) ............. 43

Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts 394............. 43

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421 .................. 43

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86 ......................... 43

Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274............. 44

Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159 ............ 43

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468 ............. 43

Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and
    Private, of the Province of Massachusetts Bay* 480 (1886).............. 39

Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556..................... 43

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656......................... 43

Act of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69............................ 43

Act of May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2 .................. 43

Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (William Waller Hening ed., 1821) ..................... 40

Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the Province of Massachusetts Bay* 52-53 (1869) .................................................... 41

Act of Nov. 16, 1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83 ....... 43

Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30 ......... 44

Act of Nov. 26, 1883, § 1, 1883 Laws of the Territory of Wash. 67.... 43

Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as are now in Force* 33 (1794) ......................................................... 41

Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* (1777) .............................................................. 39

Acts of Mar. 10, 1655, Act 12, *reprinted in* 1 *The Statutes at Large: Being a Collection of All the Laws of Virginia, From the First Session of the Legislature in the Year 1619*, 401-02 (William Waller Henning ed., 1823) .......................................................................... 31

*Acts of the General Assembly of the Province of New-Jersey* 303 (Samuel Nevill ed. 1752) ................................................................ 32

An Act to regulate the Militia, § 1, *reprinted in Public Laws of the State of Rhode-Island and Providence Plantations*, 501, 503 (Providence, Knowles & Vose 1844) ................................................. 32

Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.) ......................... 27

*Calendar of State Papers, Domestic Series,* 1670 (Mary Anne Everett Green ed., 1895)....................................................................... 28

*Calendar of State Papers, Domestic Series,* 1685 (F.H. Blackburne Daniell & Francis Bickley eds., 1938) .............................................. 28

*Calendar of State Papers, Domestic Series, Charles II, 1661-1662*, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) ..............28

*Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700-8 March, 1702* (Feb. 26, 1701) (Edward Bateson ed., 1937)..............................................................................................28

Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit,* 60 Hastings L.J. 1371 (2009) ..............................................................................52

*Chickasaw, The Scout*, *in* R.W. Surby, *Grierson Raids* (1865)..........37

Cong. Globe, 39th Cong., 1st Sess. 915 (1866)...............................37, 38

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations,* 60 Hastings L.J. 1339...........52

Don B. Kates, Jr., *The Second Amendment: A Dialogue,* 49 Law & Contemp. Probs. 143, 146 (1986) ......................................................14

Eliphalet Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed. 1792) (N.H.) .........................................................................40

G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737) ...................................29

Giles Jacob, *The Modern Justice* 338 (1716).......................................29

Gun Control Act of 1968, Pub. L. No. 90-618, § 101...........................62

H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866) ...................38

H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866 .................38

Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), *in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2 (1888).37

James Davis, *The Office and Authority of a Justice of Peace* 5 (1774) (N.C.) ..................................................................................................40

James Parker, *Conductor Generalis* 11 (Robert Campbell printing 1792) (Pa.) ...................................................................... 41

James Parker, *Conductor Generalis* 12 (1764) (N.J.) ........................ 40

James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788) (N.Y.) ................................................................................ 41

John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) ....................................................................... 36

Joseph Gales, *Prevention of Crime, in* O.H. Smith, *Early Indiana Trials and Sketches* (1858) ............................................... 36

Joseph Greenleaf, *An Abridgment of Burn's Justice of the Peace and Parish Officer* (1773) (Mass.) .......................................... 40

Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756) ............................................... 29

Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (1994) ........................................... 30

Judiciary Act of 1789, Ch. 20, § 33, 1 Stat. 73 ................................... 59

Ky. Gen. Stat. ch. 29, Art. 29, § 1 (Edward I. Bullock & William Johnson eds., 1873) ......................................................... 43

Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) ................................................. 34, 35

Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report*, Appendix, Part VI 39-40 (1897) ................................................... 28

Mass. Rev. Stat. ch. 134, § 16 (1836) ................................................. 42

Militia Act of 1662, 14 Car. 2, c. 3, § 13 (Eng.) ................................. 27

Miss. Rev. Code ch. 77, § 2964 (1880) ............................................... 43

Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) ........................................................................................... 28

Ordinance of Oct. 9, 1652, *Laws and Ordinances of New Netherland*, 1638-1674 (E.B. O'Callaghan ed., 1868) ......................................... 41

Privy Council to Lord Newport (Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, at 156 (1904) ................................................................. 28

Privy Council to the Earl of Carlisle (July 30, 1714), in *Historical Manuscripts Commission, Tenth Report*, Appendix, Part IV 343 (1885) ........................................................................................... 28

Pub.L. 90-618, 82 Stat. 1213, 1220 .................................................... 52

Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801* (1902) .................................................................. 39

Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985 (1970) ........................................................................................................... 45

Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708) ............. 29

Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 509 (2004) ........................................................................................... 33

Short Firearms, ch. 172, § 8, 1935 Wash. Sess. Laws 601 ................. 45

*State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842 ..................................................................... 36

Statute of Northampton, 2 Edw. 3, c. 3 (1328) (Eng.) ........................ 29

*The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780* (Oscar Handlin & Mary Handlin eds., 1966) .........................................................33

Theodore Barlow, *The Justice of Peace* 367 (1745)............................29

Uniform Firearms Act, No. 158, § 8, 1931 Pa. Laws 499...................45

U.S. Const. amend. II .................................................................12, 16

W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721).......................................................................................29

William Waller Hening, *The New Virginia Justice* (1795) (Va.) .......40

## Rules

Federal Rules of Appellate Procedure 34(a) .........................................4

## Regulations

18 U.S.C. § 3231 ...................................................................................3

28 U.S.C. § 1291 ...................................................................................3

## INTRODUCTION

At the time Jaren Stennerson was found with a firearm he admitted to being a drug addict who took a "shot" a day of methamphetamine. He also admitted that when he received the firearm, he was under indictment for Felony Drug Possession and Burglary. Stennerson was indicted and subsequently pleaded guilty to violations of 18 U.S.C. § 922(g)(3), possession of a firearm by an unlawful drug user, and 18 U.S.C. § 922(n), receipt of a firearm while under indictment. He reserved his right to appeal and challenges the constitutionality of the statutes.

Stennerson's challenges to 18 U.S.C. § 922(g)(3) are foreclosed by the Court's caselaw. His contention that the statute is unconstitutionally vague is foreclosed by *United States v. Purdy*, 264 F.3d 809, 813 (9th Cir. 2001), which holds that defendant's regular, extended drug use contemporaneous with his firearms possession is sufficient to put him on notice he is an "unlawful user." His claim that the statute violates the Second Amendment is similarly foreclosed by *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011). The Supreme Court's holding that a state cannot "prevent[] *law-*

*abiding citizens* with ordinary self-defense needs from exercising their right to keep and bear arms" in public, *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 142 S.Ct. 2111, 2156 (2022) (emphasis added), is not clearly irreconcilable with that binding precedent.

Moreover, even setting aside circuit precedent, the historical tradition of firearms regulation makes clear that 18 U.S.C. § 922(g)(3) is consistent with Congress's authority to disarm those who pose an unacceptable risk of danger if armed. Section 922(g)(3) is justified by the danger created by firearms possession by those engaging habitual illegal activity, combined with the difficulty exercising self-control that comes from drug abuse. The statute imposes no burden on the rights of *law-abiding* citizens because "an unlawful drug user may regain his right to possess a firearm simply by ending his drug use." *Dugan*, 657 F.3d at 998.

Stennerson's challenge to 18 U.S.C. § 922(n) fails for similar reasons. The statute is consistent with the Nation's tradition of restrictions on liberties of those pending indictment, including detention that necessarily entails greater restrictions on firearm possession and other freedoms.

2

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction under 28 U.S.C. § 1291. Final judgment was entered on July 12, 2023. ER-3. The defendant timely filed a notice of appeal the same day. ER-83.

## STATEMENT OF THE ISSUES

I. **Whether 18 U.S.C. § 922(g)(3), which bars possession of firearms by unlawful drug users, is unconstitutional under the Second Amendment on its face.**

II. **Whether 18 U.S.C. § 922(n), which bars receipt of firearms by those under felony indictment, is unconstitutional under the Second Amendment on its face.**

III. **Whether 18 U.S.C. § 922(g)(3) is unconstitutionally vague as applied to Stennerson, who admitted using a "shot" a day of methamphetamine, and whether Ninth Circuit precedent forecloses a facial challenge to the statute.**

## STATEMENT OF THE CASE

A federal grand jury indicted Stennerson for prohibited person in possession of a firearm under 18 U.S.C. § 922(g)(3), and receipt of a firearm while under indictment under 18 U.S.C. § 922(n). ER-81. Stennerson filed a motion to dismiss the indictment, which was denied. ER-19.

3

Stennerson subsequently pled guilty to both counts in the indictment, reserving his right to appeal. ER-10. The district court sentenced Stennerson to 21 months of imprisonment and three years of supervised release. ER-4-5. Stennerson appeals. ER-83.

## STATEMENT REGARDING ORAL ARGUMENT

Under Federal Rules of Appellate Procedure 34(a), the United States advises the Court of its view that oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs and record.

## STATEMENT OF FACTS

**I. Stennerson, an admitted methamphetamine addict, engages in a series of crimes related to his drug addiction.**

Jaren Stennerson began using methamphetamine at the age of 18. PSR ¶ 49. By 2022, when he was 37, he admitted using a "shot," (about one gram) every day. ER-33, PSR ¶ 49. During an arrest for methamphetamine possession in 2019, Stennerson acknowledged he possessed methamphetamine and syringes because he was an addict. ER-60.

Stennerson's methamphetamine addiction became tied to criminal activity and firearms. *See* SER-15 (defendant's

acknowledgement that the explanation for his criminal history was "mainly my drug abuse"); SER-13 (defense counsel's acknowledgement that "when these offenses started to be committed it really kind of [was] when his substance abuse really, really took off"). In February 2018, Stennerson was pulled over for speeding. PSR ⁋ 32. He fled, first in his vehicle and then on foot, wearing a large trench coat. *Id.* When he returned to the vehicle, without the coat, he appeared to be under the influence of drugs and had multiple shotgun shells, knives, and a syringe with methamphetamine residue on his person. PSR ⁋ 37. Officers found a small bag of methamphetamine and two tablets of morphine in the car. PSR ⁋ 32.

Then, in October 2018, Stennerson was arrested for stealing a firearm magazine and a tool from a sporting goods store. PSR ⁋ 29. Less than a month later, he was involved in a much more dangerous encounter. Stennerson and two others broke into a garage to steal chain saws and other items. PSR ⁋ 30. Billings police were called and a responding officer, hearing breaking glass and the closing of car doors, hurried to the alleyway. *Id.* The car into which

Stennerson and the others had fled sped towards the officer. The officer, after evading the speeding car, fired his gun into the vehicle, wounding the driver in the face. *Id.* Stennerson fled and an arrest warrant was issued for felony burglary.

In August 2019, Stennerson was arrested on charges related to the burglary. As noted above, he was found with methamphetamine and syringes in his possession, which he admitted were related to his drug addiction. PSR ⁋ 31; ER-60. Felony criminal possession of dangerous drugs was added to his charges.

## II. Stennerson is caught with a firearm and is indicted for possession of firearm by an illegal drug user and receipt of a firearm while under felony indictment.

Finally, in March 2022, United States Marshals and members of the Montana Violent Offenders Task Force were searching for Michael Torres, who had a federal arrest warrant. PSR ⁋ 9. Stennerson and Torres were found together and detained. *Id.* A pat search of Stennerson revealed two fixed blade knives and a 9mm pistol. PSR ⁋ 10. Officers learned the firearm had been reported stolen a year earlier and that Stennerson was under indictment for Felony Drug Possession and Burglary. PSR ⁋ 11. Stennerson had

6

also been released by the state court on conditions prohibiting his possession of firearms. *Id.* After he was arrested, officers located "an improvised destructive device" in his bag, for which he was subsequently prosecuted by the state. PSR ⁋11.

When questioned, Stennerson denied knowing the firearm was stolen, but admitted to being under felony indictment and advised he was a daily methamphetamine user who used "a shot a day." ER-33.

### III. The district court denies Stennerson's motion to dismiss the indictment, accepts his guilty pleas, and sentences Stennerson to 21 months imprisonment.

Stennerson moved to dismiss the indictment on the ground that 18 U.S.C. § 922(g)(3) and 18 U.S.C. § 922(n) are unconstitutional under the Second Amendment and that 18 U.S.C. § 922(g)(3) is unconstitutionally vague. ER-61-79. The district court denied the motion on all grounds. ER-19-24.

The court concluded the Second Amendment's protections do not extend to the possession of firearms by unlawful users of controlled substances or those pending felony charges. Both § 922(g)(3) and § 922(n) fall within the nation's long-standing tradition of disarming citizens who engage in criminal activity, those

7

with mental impairments, or those who were otherwise deemed dangerous. ER-20-23. The Court also found Stennerson could not show that § 922(g)(3) is unconstitutionally vague as applied to him "because his routine and prolonged use of methamphetamine was contemporaneous to his gun possession which put him on notice he was an 'unlawful user.'" *Id.*

Stennerson entered a conditional guilty plea preserving his right to appeal the denial of his motion to dismiss. ER-16. He was sentenced to 21 months imprisonment. At sentencing the court summarized the danger Stennerson posed as a habitual drug user with a firearm:

> And possession of a firearm coupled with somebody who is struggling so significantly with substance abuse issues, using methamphetamine and marijuana, et cetera, presents a danger to the community, Mr. Stennerson. Obviously, when you are under the influence you are not making good decisions, and if you have easy access to a firearm, that could lead to some very dangerous and perhaps even deadly circumstances. SER-18.

This appeal followed. ER-83-84.

## SUMMARY OF ARGUMENT

Stennerson's convictions should be affirmed. Ninth Circuit precedent upholding § 922(g)(3) remains binding precedent and forecloses Stennerson's claims. Moreover, even if the Court's pre-*Bruen* case law is no longer binding, § 922(g)(3) poses no burden on a law-abiding citizen's right to keep and bear arms and is consistent with the Nation's historical regulation of firearms possession by those who pose an unacceptable risk of danger if armed. Section 922(g)(3) restricts firearm possession of only those who cannot or will not refrain from illegal activity and Congress, in addressing "unprecedented contemporary concerns regarding drug abuse," is entitled to address the unacceptable risk of crime and firearms misuse posed by habitual drug users. This is illustrated by Stennerson's own admission that his drug abuse was the main driver in a criminal history that culminated in both a violent encounter with police and possession of an improvised destructive device.

Similarly, § 922(n), which limits receipt of a firearm by an individual under felony indictment, imposes no burden on a law-abiding citizen's right to bear arms. The regulation, justified by a

9

finding of probable cause of a serious crime, is consistent with the historical tradition limiting the liberties of indictees beyond those of ordinary, law-abiding citizens. The regulation imposes a much lower burden on indictees than those historically recognized as constitutional, including pre-trial detention, which necessarily entails a complete ban on firearm possession as well as much greater restrictions on liberty.

Finally, Stennerson's claim that § 922(g)(3) is unconstitutionally vague is foreclosed by precedent. This Court has rejected facial challenges to the statute on vagueness grounds, and intervening Supreme Court cases addressing vagueness in a different context are not irreconcilable. Moreover, this Court has held that "unlawful drug user" is not unconstitutionally vague where the government proves a defendant's drug use is regular, extended, and contemporaneous with his firearm possession such that he is reasonably on notice of his conduct.

## ARGUMENT

**I.    Stennerson cannot show the United States' prohibition on possession of a firearm by an unlawful user of a controlled substance is unconstitutional.**

**Standard of review:**  This Court reviews the constitutionality of a statute de novo.  *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010).  "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

### A.    Section 922(g)(3) is Constitutional Under the Precedents of Both the Supreme Court and this Court.

#### 1.  The Supreme Court held in Heller that the Second Amendment protects an individual right of law-abiding citizens.

Stennerson's challenge to the constitutionality of 18 U.S.C. § 922(g)(3) is foreclosed by Supreme Court and Ninth Circuit precedent.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people

11

to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court concluded, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. 570, 595 (2008).

The Court made clear, however, that "the right secured by the Second Amendment is not unlimited." *Id.* at 626; *cf. id.* at 635. With respect to the Second Amendment, the Court identified the right to keep and bear arms as belonging to "law-abiding, responsible citizens." *Id.* at 635. And consistent with that understanding, the Court specifically stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," which the Court deemed "presumptively lawful." *Id.* at 626 & n.26. Indeed, the Court held that Heller—the plaintiff in that case—would be entitled to keep a handgun in his home "assuming" that he is "not disqualified from the exercise of Second Amendment rights." *Id.* at 635; *see also id.* at 631 (interpreting "not otherwise disqualified" to mean "not a felon and is not insane").

Two years later, in *McDonald v. City of Chicago*, a plurality of the Court "repeat[ed]" the "assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" 561 U.S. 742, 786 (2010) (quoting *Heller*, 554 U.S. at 626).

> ### 2. This Court upheld § 922(g)(3) based on *Heller's* recognition that the prohibition of gun possession while contemporaneously engaging in unlawful drug use was consistent with similar long-standing prohibitions.

Following *Heller* and *McDonald*, this Court has upheld the constitutionally of § 922(g)(3) based on the Supreme Court's articulation of the scope and limits of the right to bear arms.

Importantly, this Court's decision in *Vongxay* rejected a felon's claim that § 922(g)(1) violated his Second Amendment rights. 594 F.3d at 1118. This Court determined that "[n]othing in *Heller* can be read legitimately to cast doubt on the constitutionality of § 922(g)(1)." *Id.* at 1114-15. In particular, the Court emphasized *Heller's* recognition that its holding was limited to those "not disqualified from the exercise of Second Amendment rights." *Vongxay*, 594 F.3d at 1115 (quoting *Heller*, 554 U.S. at 635); *see id.* at 1116 (explaining

13

that "limit[s] to the scope of [a court's] holdings ... are integral to those holdings").  Turning to the historical record, the Court observed that "most scholars of the Second Amendment agree that the right to bear arms was 'inextricably ... tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)…'"  *Id.* at 1118 (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue,* 49 Law & Contemp. Probs. 143, 146 (1986)).  The Court concluded that 18 U.S.C. § 922(g)(1) did not violate the Second Amendment as applied to convicted felons.  *Id.*

Following *Vongxay*, the Court addressed 18 U.S.C. § 922(g)(3) directly in *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011).  The Court held that "[b]ecause Congress may constitutionally deprive felons and mentally ill people of the right to possess and carry weapons, we conclude that Congress may also prohibit illegal drug users from possessing firearms."  *Id.* at 999-1000.

14

Although predating *Bruen*, *Dugan* addressed both the "comparabl[e] just[ification]" and "comparable burden" imposed by § 922(g)(3) compared with the long-standing prohibitions that were presumed lawful in *Heller* and, with respect to felons, determined lawful in *Vongxay*. The Court concluded that habitual drug users were prohibited for the same reason as felons and the mentally ill: "we see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so." *Dugan*, 657 F.3d at 999. The Court also determined that the burden imposed by the regulation was "far less onerous" than that constitutionally imposed on other classes: "unlike people who have been convicted of a felony or committed to a mental institution and so face a lifetime ban, an unlawful drug user may regain his right to possess a firearm simply by ending his drug abuse." *Id.* On that basis, the Court found the statute constitutional.

### 3. *Dugan remains controlling precedent.*

The Supreme Court's recent decision in *Bruen* does not disturb the logic or holding of *Dugan*. *Heller* based its reasoning on the "text

15

and history" of the Second Amendment, 554 U.S. at 595, as did *Vongxay*, 594 F.3d at 1115, 1118 (relying on the historical analysis in *Heller* and by "scholars of the Second Amendment"). And in *Bruen* the Supreme Court reaffirmed this focus on "the Second Amendment's text, as informed by history." 142 S.Ct. at 2127; *see also id.* at 2128-29 ("constitutional text and history").

*Bruen* involved a state licensing regime for the public carrying of handguns that required applicants to demonstrate a "special need" to carry a gun in public. *Id.* at 2122. Both the applicants and the state agreed that the Second Amendment (as incorporated by the Fourteenth Amendment) "protect[s] the right[s]" of "ordinary, law-abiding citizens ... to carry handguns publicly for their self-defense." *Id.* The court of appeals, however, had upheld the "special need" licensing regime on the ground that it satisfied intermediate scrutiny—i.e., that restricting the right to bear arms in public to those with a special need was "'substantially related to the achievement of an important governmental interest.'" *Id.* at 2125.

*Bruen* rejected such an "interest-balancing inquiry" or "means-end test" as inconsistent with *Heller*. *Id.* at 2129 (quotation marks

omitted). Instead, a court should look to "text and history" to "defin[e] the character of the right" or "the outer limits of the right," or to "assess[] the constitutionality of a particular regulation." *Id.* (quotation marks omitted). *Bruen* then undertook a lengthy historical analysis, *id.* at 2138-56, concluding that a state cannot "prevent[] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms" in public. *Id.* at 2156.

Nothing in *Bruen* undermined *Vongxay* or *Dugan* or displaced *Heller*'s recognition that felons and the mentally ill can be disqualified from the right to bear arms. To the contrary, *Bruen*'s analysis implicitly acknowledged *Heller*'s exclusion of felons from "the people" protected by the Second Amendment. *See* 142 S.Ct. at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, *law-abiding*, adult citizens—are part of 'the people' whom the Second Amendment protects." (emphasis added, citing *Heller*, 554 U.S. at 580)). Indeed, *Bruen* repeatedly limited its definition of the scope of the right to "law-abiding" citizens, using that phrase no fewer than *14 times* throughout the opinion. *See* 142 S.Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156. It is telling

17

that *Bruen* expressly framed the test of whether a modern law was consistent with the Nation's historical tradition of firearms regulation by asking if it was analogous to historic regulations based on "how and why the regulations burden *a law-abiding citizen's* right to armed self-defense.'" *Bruen*, 142 S.Ct. at 2132-33 (emphasis added).

*Bruen* additionally stressed that it was "reiterat[ing]" *Heller's* approach, clarifying the legal standard "[i]n keeping with *Heller*," and "apply[ing]" the "test that [the Court] set forth in *Heller*." 142 S.Ct. at 2126, 2129, 2131. Indeed, three justices who joined the Court's decision underscored the limits of *Bruen* and expressly noted that felon-possession prohibitions fell within them. *See id.* at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (reiterating that "longstanding prohibitions on the possession of firearms by felons" are constitutional under *Heller* and *McDonald* (quotation marks omitted)); *id.* at 2157 (Alito, J., concurring) (explaining that *Bruen* did not "disturb[] anything that [the Court] said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns" (citation omitted)). Justice Alito made the point

18

clearly: "All that we decide in this case is that the Second Amendment protects the right of *law-abiding* people to carry a gun outside the home for self-defense." *Id.* at 2159 (emphasis added).

While *Dugan*'s analysis is brief and efficient, its logic is unassailable. As long as longstanding prohibitions on firearm possession by felons and the mentally ill are constitutionally permissible, prohibitions on possession by habitual drug users, which are based on a similar assessment of dangerousness and are far less onerous, are likewise constitutional. In fact, § 922(g)(3) imposes *no* burden on law-abiding citizens since to regain gun rights one need only cease engaging in *illegal* activity.

*Bruen* identified those same metrics of comparison. 142 S.Ct. at 2132-33 (holding permissible firearms regulations must be consistent with a historical tradition of firearms regulation as judged by "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense"). While *Dugan* did not conduct the historical comparison directly, it drew upon the historical tradition of firearms regulation articulated by the Supreme Court and this Court with respect to felons and the mentally ill and

19

applied the appropriate metrics to determine that the limitation on possession by habitual drug users addressed a similar danger and imposed a lower burden. Nothing in *Bruen* is clearly irreconcilable with that analysis.[1]

Importantly, *Dugan* was decided well before the Ninth Circuit adopted any test employing "means-end scrutiny." *See* Op. Br. at 15 (indicating that the Court adopted such a test in *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)). No such test is mentioned or employed in *Dugan*, which focused on the fact that § 922(g)(3) "embodies a long-standing prohibition of conduct similar" to the prohibitions *Heller* concluded Congress could constitutionally

---

[1] This Court has several cases before it addressing the continued viability of *Vongxay* in light of *Bruen*. *See United States v. Duarte*, No. 22-50048; *United States v. Butts*, No. 23-313; *United States v. Rojo*, No. 23-598; *United States v. Registe*, No. 20-30042; *United States v. Howard*, No. 22-10211; *United States v. Martinez*, No. 23-1125. The United States acknowledges that if the Court were to determine that *Vongxay* was no longer binding precedent, it would likely undermine the precedential nature of *Dugan* as well. If, however, as the government argued in the cases cited, the Court determines that *Vongxay* is not clearly irreconcilable with *Bruen*, *Dugan* remains precedential based on the same logic.

apply and imposed a more limited burden on Second Amendment rights based on similar concerns regarding dangerousness.[2]

Stennerson makes no meaningful effort to contest the precedential nature of *Dugan*, merely asserting in a footnote that the district court "failed to explain" why *Vongxay* and *Dugan* are not clearly irreconcilable. Op. Br. at 20 n.3. This is, of course, inaccurate. The district court held, consistent with other decisions in the District of Montana, that *Bruen* did not overrule "*Heller*'s express language regarding the lawful prohibitions on felons in possession of firearms," which was applied in *Vongxay* and, by analogy, in *Dugan*, which "concluded that habitual drug users in possession of firearms pose the same dangers as felons and the mentally ill." ER-22.

---

[2] *Dugan* does reference *United States v. Yancy*, which articulates a means-ends test. 621 F.3d 681, 683 (7th Cir. 2010). The points drawn from *Yancy*, however, relate to the congressional motive for enacting the statute, *see id.* at 683 ("Congress enacted the exclusions in § 922(g) to keep guns out of the hands of presumptively risky people."), and the extent to which the provision burdens Second Amendment rights, *id.* at 686-87 ("[T]he restriction in § 922(g)(3) is far less onerous than those affecting felons and the mentally ill."). Those propositions are consistent with *Bruen*'s analysis.

21

Accordingly, *Vongxay* and *Dugan* remain controlling circuit precedent. A circuit panel may disregard circuit precedent only when "the reasoning or theory of [the] prior circuit authority is clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003). The fact that *Bruen* rejected an analysis that neither *Vongxay* nor *Dugan* deploy—means-end scrutiny—does not mean that *Bruen* "effectively overruled" either decision. *Miller*, 335 F.3d at 893. *Dugan* remains binding precedent, and it forecloses Stennerson's argument.

> **B.  Even if *Bruen* Had Abrogated this Court's Precedent, Stennerson Cannot Show that 18 U.S.C. § 922(g)(3) Is Facially Unconstitutional.**

Stennerson contends that § 922(g)(3) is unconstitutional on its face. To succeed on such a challenge, he must show that there is no set of circumstances under which the statute can constitutionally be applied. *Salerno*, 481 U.S. at 746. In light of the Second Amendment's text and history he cannot succeed on such a challenge.

22

The Second Amendment guarantees an individual right to possess and carry arms for self-defense. But as the Supreme Court has repeatedly emphasized, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *Bruen*, 142 S.Ct. at 2128; *McDonald*, 561 U.S. at 786.

*Bruen* adopted a two-part test "rooted in the Second Amendment's text, as informed by history" to define the contours of the right to bear arms:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, ... the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S.Ct. at 2126 (citation omitted).

This Court has recently had the opportunity to articulate the application of this test in *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023). As the Court explained, "*Bruen* step one involves a threshold inquiry" requiring "textual analysis, determining whether the challenger is 'part of "the people" whom the Second Amendment protects,' whether the weapon at issue is "'in

23

common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment." *Id.* (quoting *Bruen*, 142 S.Ct. at 2134-35).

If the first step is satisfied, the second step requires the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation." *Id.* (quoting *Bruen*, 142 S.Ct. at 2130). As the Ninth Circuit explained, "to carry its burden, the government must produce representative analogues to demonstrate that the challenged law is consistent with a historical tradition of regulation." *Id.* The analogue must be "'relevantly similar' as judged by 'at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" *Id.* (quoting *Bruen*, 142 S.Ct. at 2132-33).

Importantly, the analogue required at step two need not be a "historical *twin*." *Bruen*, 142 S.Ct. at 2133. Rather, the Court uses history to "guide [its] consideration of modern regulations that were unimaginable at the founding." *See id.* at 2132. This Court has made clear that "contemporary concerns regarding drug abuse" are

24

"unprecedented." *Alaniz*, 69 F.4th at 1129. The Court noted that *Bruen* expressly recognized that "cases implicating unprecedented societal concerns," like drug abuse, "may require a more nuanced approach." *Id.* at 1130; *see also id.* at 1129 ("Illegal drug trafficking is a largely modern crime").

A close examination of the historical record demonstrates the Second Amendment does not prevent Congress from banning firearm possession by those contemporaneously using or addicted to illegal drugs. Section § 922(g)(3) comports with the Nation's historical tradition of firearms regulation.[3]

> *1. Supreme Court precedents recognize that Congress may disarm persons who are not law-abiding, responsible citizens.*

As discussed above, *Heller*, *McDonald*, and *Bruen* make clear that the Second Amendment protects only law-abiding, responsible

---

[3] The Supreme Court will address the constitutionality of § 922(g)(8), which prohibits possession of firearms by individuals subject to domestic-violence restraining orders, in *United States v. Rahimi*, No. 22-915. Oral argument was held in *Rahimi* on November 7, 2023. Although *Rahimi* concerns a different subsection of § 922, the Supreme Court's decision in that case will likely provide guidance to this Court's analysis of § 922(g)(3).

citizens. Many aspects of Second Amendment doctrine rest on this premise. In judging whether a modern firearms regulation is consistent with a historical precursor, a court must ask "how and why the regulations burden a *law-abiding* citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2133 (emphasis added); *Alaniz*, 69 F.4th at 1128. In judging whether a weapon is dangerous and unusual, a court must consider whether the weapon is "typically possessed by *law-abiding* citizens for lawful purposes." *Heller*, 554 U.S. at 625 (emphasis added). And states may require applicants for gun permits to pass background checks and take safety courses because such requirements ensure that those who carry guns "are, in fact, '*law-abiding*, responsible citizens.'" *Bruen*, 142 S.Ct. at 2138 n.9 (citation omitted) (emphasis added). Those legal principles all reflect the understanding that the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens and are deeply grounded in the Nation's history.

/ / /

/ / /

/ / /

26

      *2. The historical understanding of the right to bear arms confirms that Congress may disarm persons who are not law-abiding, responsible citizens.*

The Second Amendment's history illuminates its meaning. *See Bruen*, 142 S.Ct. at 2128-2129. Historical evidence from before, at, and after the Founding leads to the same conclusion: the legislative branch may disarm persons who are not law-abiding, responsible citizens.

**Pre-Founding.** Parliament first recognized a legal right to possess arms in the Bill of Rights, 1 W. & M. Sess. II, c. 2 (1688) (Eng.). The Bill recited that King James II, who had been deposed in the Glorious Revolution, had disarmed "severall good subjects being Protestants." *Id.* To prevent the repetition of that abuse, the Bill guaranteed that "the Subjects which are Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law." *Id.*

While the Bill of Rights condemned the disarming of "good subjects," it allowed the disarming of irresponsible ones. It thus did not displace the Militia Act of 1662, which authorized local officials to disarm individuals they judged "dangerous to the Peace of the

27

Kingdome." 14 Car. 2, c. 3, § 13 (Eng.). Consistent with the Militia Act, the Crown often directed local officials to disarm those whom it did not trust to use weapons responsibly—for instance, those who had "disturbed the public Peace."[4] That practice continued after the adoption of the English Bill of Rights.[5] Indeed, many 18th-century

---

[4] Privy Council to Lord Newport (Jan. 8, 1661), *in Transactions of the Shropshire Archaeological and Natural History Society*, pt. 2, 3d ser., vol. 4, at 156 (1904); *see, e.g.*, *Calendar of State Papers, Domestic Series, Charles II, 1661-1662*, at 538 (Nov. 1, 1662) (Mary Anne Everett Green ed., 1861) (instructions to "cause good watch to be kept in the highways" and to disarm "such as travel with unusual arms at unseasonable hours"); *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670) (Mary Anne Everett Green ed., 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1, 1684–February 5, 1685*, at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds., 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons").

[5] *See, e.g.*, *Calendar of State Papers, Domestic Series, Of the Reign of William III, 1 April, 1700-8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed., 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report*, Appendix, Part IV 343 (1885) (similar); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report*, Appendix, Part VI 39-40 (1897) (similar); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (similar).

justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[6]

Similarly, the Statute of Northampton made the offense of "rid[ing]" or "go[ing] armed" punishable by forfeiture of the offender's "armor." 2 Edw. 3, c. 3 (1328) (Eng.); *see Bruen*, 142 S.Ct. at 2139-2142. Leading 18th-century scholars agreed that the Statute forbade carrying weapons in a terrifying manner, with violations punishable by forfeiture of the weapons.[7] The Statute thus allowed the government to disarm persons whose conduct revealed their unfitness to carry arms.

The understanding that the government could lawfully disarm irresponsible subjects remained intact at the time of the American Revolution. For example, in 1780, London officials reacted to

---

[6] Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); *see, e.g.*, Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 464 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

[7] *See, e.g.*, 4 William Blackstone, Commentaries on the Laws of England 149 (10th ed. 1787); 1 Richard Burn, The Justice of the Peace, and Parish Officer 13-14 (2d ed. 1756); 1 William Hawkins, A Treatise of the Pleas of the Crown 135 (1716).

29

widespread rioting by confiscating the rioters' arms. *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 130-131 (1994). The House of Lords debated—and rejected—a motion declaring that the confiscation violated the English Bill of Rights. *See id.* at 131-132. Members defended the confiscation on the ground that it applied only to the "disorderly" "mob," not to "sober citizens" or "citizens of character."[8] The press similarly distinguished "the riotous mob" from "citizens of character."[9] And private groups that supported the right to bear arms warned that the confiscation did not set a precedent for disarming "peaceable Subjects."[10]

---

[8] *See, e.g.*, 21 *The Parliamentary History of England, from The Earliest Period to the Year 1803*, at 691 (T.C. Hansard 1814) (speech of Lord Amherst) (June 19, 1780) (defending disarmament of the "mob"); *id.* at 730-731 (June 21, 1780) (speech of Lord Stormont) (distinguishing "disorderly" persons from "sober citizen[s]").

[9] 49 *The London Magazine or Gentleman's Monthly Intelligencer* 518 (Nov. 1780); *see, e.g.*, 42 The Scots Magazine 419 (Aug. 1780) (distinguishing "suspicious persons" from "reputable citizens").

[10] *See* 2 *The Remembrancer; or, Impartial Repository of Public Events, for the Year 1780*, at 139 (1780) (resolutions adopted in York); 1 *The Remembrancer; or Impartial Repository of Public*

In short, although the English Bill of Rights secured a right to possess arms, the government could (and did) disarm those who could not be trusted to use arms lawfully and responsibly. Because the English right "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593, that background strongly suggests that the Second Amendment likewise allows Congress to disarm individuals who are not law-abiding, responsible citizens.

**Founding era.** Consistent with the well-established principle of disarming the dangerous and those who cannot abide by the law, various colonies prohibited carrying or using a firearm while under the influence of alcohol or even during periods of high alcohol use. In 1655, Virginia prohibited "shoot[ing] any gunns at drinkeing," except at marriages and funerals. Acts of Mar. 10, 1655, Act 12, *reprinted in* 1 *The Statutes at Large: Being a Collection of All the Laws of Virginia, From the First Session of the Legislature in the Year 1619*, 401-02 (William Waller Henning ed., 1823) (sic).

---

*Events, for the Year 1781*, at 24 (1780) (resolutions adopted in Middlesex); id. at 112 (resolutions adopted in Huntingdonshire).

31

Similarly, in 1771, New York banned firing guns on New Year's Eve and the first two days of January to prevent "great Damages ... frequently done on [those days] by persons ... with Guns and other Fire Arms and being often intoxicated with Liquor." *Heller*, 554 U.S. at 632, 128 S.Ct. 2783 (quoting Ch. 1501, 5 Colonial Laws of New York 244-46 (1894)). And New Jersey enacted a statute in 1746 that authorized the disarming of any soldier who "appear[ed] in Arms disguised in Liquor." *Acts of the General Assembly of the Province of New-Jersey* 303 (Samuel Nevill ed. 1752).

Many states also prohibited the sale of any strong liquor near militia-training locations. *United States v. Okello*, __ F.Supp.3d __, 2023 WL 551828, at *4 (D.S.D. Aug. 23, 2023) (referencing collected statutes). And at least one state excluded "common drunkards" from the militia entirely. An Act to regulate the Militia, § 1, *reprinted in Public Laws of the State of Rhode-Island and Providence Plantations*, 501, 503 (Providence, Knowles & Vose 1844). "Though these militia regulations may facially appear narrower than § 922(g)(3), in practice, they affected large swaths of the population, given that many states included all able-bodied free men in their militias and

32

only exempted certain subsets due to factors such as age or profession." *Okello*, 2023 WL 5515828, at *4 (citing Saul Cornell & Nathan DeDino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 509 (2004)).

Consistent with these type of restrictions, many precursors to the Second Amendment described the class of persons entitled to keep and bear arms using synonyms for "law-abiding, responsible citizens." In 1780, for example, the town of Williamsburg proposed amending the newly drafted Massachusetts constitution to provide that "the people have a right to keep and bear Arms for their Own and the Common defence." *The Popular Sources of Political Authority: Documents on the Massachusetts Constitution of 1780*, at 624 (Oscar Handlin & Mary Handlin eds., 1966). The town explained: "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and *while we Continue honest and Law-full Subjects of Government* we Ought Never to be deprived of them." *Id.* (emphasis added).

Anti-Federalists expressed a similar understanding of the right at Pennsylvania's ratifying convention. They proposed a bill of rights

33

that, among other things, forbade "disarming the people, or any of them, *unless for crimes committed, or real danger of public injury from individuals.*" 2 *The Documentary History of the Ratification of the Constitution (Documentary History)* 598 (Merrill Jensen ed., 1976) (emphasis added). The Federalists defeated the proposal, but the Anti-Federalists published it in the Dissent of the Minority of the Convention, *id.* at 624, which was widely read and proved "highly influential," *Heller*, 554 U.S. at 604.

At the Massachusetts ratifying convention, Samuel Adams similarly proposed a bill of rights that would have denied Congress the power "to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." 6 *Documentary History* 1453 (John P. Kaminski & Gaspare J. Saladino eds., 2000) (emphasis added). A contemporary described the proposal as an effort to protect "the right of peaceable citizens to bear arms." Letter from Jeremy Belknap to Ebenezer Hazard (Feb. 10, 1788), *in* 7 *Documentary History* 1583 (John P. Kaminski & Gaspare J. Saladino eds., 2001) (emphasis added). The convention rejected the proposal,

34

but only because Adams had waited until the morning of the day of ratification to present it. *Id.*

Although those precursors used different language from the Second Amendment, they shed light on the Amendment's meaning. *See Heller*, 554 U.S. at 604 (relying on the "minority proposal in Pennsylvania" and "Samuel Adams' proposal"). The Amendment codified a "pre-existing," "venerable," and "widely understood" right, making it unlikely that "different people of the founding period had vastly different conceptions" of its scope. *Id.* at 603-605. The precursors discussed above reveal a common conception that the government may disarm those who are not law-abiding, responsible citizens.

**Post-Founding.** Antebellum commentators shared the Founding generation's understanding of the Second Amendment's scope. Not every commentator who discussed the right specifically addressed the government's power to disarm certain individuals— just as not every commentator specifically discussed its power to prohibit dangerous and unusual weapons or to bar carrying weapons in sensitive places. But the commentators that did address the issue

35

confirmed that the government may disarm those who are not responsible or law-abiding.

For example, John Holmes, a legal scholar from Maine, interpreted the Second Amendment and its state counterpart to mean that a "free citizen, *if he demeans himself peaceably*, is not to be disarmed." John Holmes, *The Statesman, or Principles of Legislation and Law* 186 (1840) (emphasis added). "Thus are the rights of self defence guarded and secured," he added, "to every one *who entitles himself by his demeanor* to the protection of his country." *Id.* (emphasis added). A state convention in Rhode Island resolved that the Second Amendment forbade "taking from peaceable citizens their arms." *State Convention of the Suffrage men of Rhode Island*, Vermont Gazette, Dec. 13, 1842, at 1. And Joseph Gales, a mayor of Washington, D.C., recognized the right of a "peaceable citizen" to bear arms, but asked rhetorically, "why should not the lawless ruffian be disarmed and deprived of the power of executing the promptings of his depraved passions?" Joseph Gales, *Prevention of Crime*, *in* O.H. Smith, *Early Indiana Trials and Sketches* 466-467 (1858).

Sources from during the Civil War reflect the same understanding. In 1863, a Union general ordered that "all loyal and peaceable citizens in Missouri will be permitted to bear arms." Hdqrs. Dep't of the Missouri, General Orders, No. 86 (Aug. 25, 1863), *in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, ser. 1, vol. 22, pt. 2, at 475 (1888). A war memoir recounted a Union soldier's belief that "it was unconstitutional to disarm peac[e]able citizens." *Chickasaw, The Scout*, *in* R.W. Surby, *Grierson Raids* 253 (1865). And after the war, Senator Henry Wilson defended Congress's "power to disarm ruffians or traitors, or men who are committing outrages against law or the rights of men." Cong. Globe, 39th Cong., 1st Sess. 915 (1866).

As Reconstruction began, many southern States sought to disarm Black citizens, prompting "an outpouring of discussion" about the right to keep and bear arms. *Heller*, 554 U.S. at 614. Participants in that discussion affirmed the right to possess arms for self-defense, yet cautioned that the right protected only "peaceable" or "well-disposed" citizens. In Georgia, for example, the Freedmen's Bureau issued a circular explaining that "[a]ll men, without

37

distinction of color, have the right to keep arms," but that "[a]ny person, white or black, may be disarmed if convicted of making an improper and dangerous use of arms."  H.R. Exec. Doc. No. 70, 39th Cong., 1st Sess. 65 (1866).  The Bureau also recognized that the "freedmen of South Carolina have shown by their peaceful conduct that they can safely be trusted with fire-arms."  H.R. Rep. No. 30, 39th Cong., 1st Sess. Pt. II, 229 (1866).  And a Reconstruction order guaranteed the "constitutional rights of all loyal and well-disposed inhabitants" in South Carolina, but added that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. at 908-909.

All told, post-ratification sources point in the same direction as English and Founding Era sources.  Although different commentators used different terms—"peaceable," "well-disposed," and so on—they recognized that a legislature could disarm those who were not law-abiding, responsible citizens.

> ### 3. The Nation has a long tradition of disarming persons who are not law-abiding, responsible citizens.

"[T]his Nation's historical tradition of firearm regulation" further illuminates the Second Amendment's scope. *Bruen*, 142 S.Ct. at 2126. And the United States has a longstanding tradition, dating to colonial times and continuing to the present, of disarming persons whom legislatures have found are not law-abiding, responsible citizens.

Most relevant here, early American legislatures denied arms to classes of individuals considered unfit to possess them. When the Revolutionary War began, for example, the Continental Congress recommended, and most States enacted, laws disarming loyalists and others who refused to swear allegiance to the new Republic.[11]

---

[11] *See* 4 *Journals of the Continental Congress 1774-1789*, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776); Act of Dec. 1775, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New-Jersey* 90 (1777); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905); Act of May 1, 1776, ch. 21, § 2, 5 *Acts and Resolves, Public and Private, of the Province of Massachusetts Bay* 480 (1886); Resolves of Apr. 6, 1776, 8 *The Statutes at Large of Pennsylvania from 1682-1801*, at 559-561 (1902); Act of 1776, 7 *Records of the Colony of Rhode Island and*

Similarly, after putting down Shays' Rebellion in 1787,

Massachusetts required the rebels, as a condition of being pardoned,

to surrender their arms, which would be returned to them after three

years if they kept the peace.[12]

Colonies and early States also punished irresponsible use of

arms with forfeiture of the arms. Early American justice-of-the-

peace manuals explained that the Statute of Northampton—which

the colonies inherited along with other pre-colonization statutes, *see*

*Patterson v. Winn*, 5 Pet. 233, 241 (1831)—empowered justices of the

peace to confiscate the arms of persons who carried them in a

manner that spread fear or terror.[13] Some 17th- and 18th-century

---

*Providence Plantations in New England* 567 (John Russell Bartlett
ed., 1862); Act of May 1777, ch. 3, 9 *The Statutes at Large: Being a
Collection of All the Laws of Virginia, from the First Session of the
Legislature, in the Year 1619*, at 282 (William Waller Hening ed.,
1821).

[12] *See* Act of Feb. 16, 1787, §§ 1-3, 1 *Private and Special
Statutes of the Commonwealth of Massachusetts* 145-147 (1805).

[13] *See, e.g.*, James Davis, *The Office and Authority of a Justice
of Peace* 5 (1774) (N.C.); Joseph Greenleaf, *An Abridgment of Burn's
Justice of the Peace and Parish Officer* 12-13 (1773) (Mass.); William
Waller Hening, *The New Virginia Justice* 18 (1795) (Va.); Eliphalet
Ladd, *Burn's Abridgement, Or The American Justice* 22-24 (2d ed.
1792) (N.H.); James Parker, *Conductor Generalis* 12 (1764) (N.J.);
James Parker, *Conductor Generalis* 12 (Robert Hodge printing 1788)

American statutes expressly recodified that rule.[14]  Others made

forfeiture part of the penalty for offenses such as unsafe storage of

guns or gunpowder.[15]  Although those laws involved forfeiture of

arms involved in an offense, rather than bans on possessing arms,

they show that legislatures could restrict an individual's ability to

bear arms if his conduct suggested he would not use them

responsibly.

A few decades later, States began to adopt surety statutes that

required certain potentially irresponsible individuals who carried

_____

(N.Y.); James Parker, *Conductor Generalis* 11 (Robert Campbell
printing 1792) (Pa.).

[14] *See* Act of Nov. 1, 1692, ch. 18, § 6, 1 *Acts and Resolves of the
Province of Massachusetts Bay* 52-53 (1869); Act of June 14, 1701, ch.
7, 1 *Laws of New Hampshire* 679 (Albert Stillman Batchellor ed.,
1904); Act of Nov. 27, 1786, ch. 21, *A Collection of all such Acts of the
General Assembly of Virginia, of a Public and Permanent Nature, as
are now in Force* 33 (1794).

[15] *See* Act of Mar. 1, 1783, ch. 46, 1782-83 Mass. Acts 120
(1890); Act of Feb. 18, 1794, § 1, *The Laws of the State of New
Hampshire* 460 (1815); Ordinance of Oct. 9, 1652, *Laws and
Ordinances of New Netherland*, 1638-1674, at 138 (E.B. O'Callaghan
ed., 1868); Act of Mar. 15, 1788, ch. 81, §1, 2 *Laws of the State of
New-York*, 95-96 (2d ed. 1807); Act of Dec. 6, 1783, ch. 1059, § 1, 11
*The Statutes at Large of Pennsylvania from 1682 to 1801*, at 209-210
(1906).

firearms to post bond.  *See Bruen*, 142 S.Ct. at 2148.  The earliest

such statute, enacted by Massachusetts, required a gun owner to

post bond if his conduct created "reasonable cause to fear an injury,

or breach of the peace," and if he lacked a special need for self-

defense.  Mass. Rev. Stat. ch. 134, § 16 (1836).  At least nine other

jurisdictions adopted variants of that law later in the 19th century.

*See Bruen*, 142 S.Ct. at 2148 n.23 (collecting statutes).  Those laws,

too, confirm that irresponsible individuals were subject to special

restrictions that did not (indeed, could not) apply to ordinary, law-

abiding citizens.  *See id.* at 2122 (holding a proper-cause requirement

unconstitutional as applied to ordinary citizens).

Continuing in the 19th century, as guns became more lethal

and more widely available, legislatures disarmed a range of

individuals whom they deemed unfit to carry firearms.  At least 29

jurisdictions banned or restricted the sale of firearms to, or the

possession of firearms by, individuals below specified ages.[16]  Several

---

[16] *See* Act of July 13, 1892, ch. 159, § 5, 27 Stat. 117 (D.C.); Act
of Feb. 2, 1856, No. 26, § 1, 1856 Ala. Acts 17; Act of Apr. 8, 1881, ch.
548, § 1, 16 Del. Laws 716 (1881); Act of Feb. 4, 1881, ch. 3285, No.
67, § 1, 1881 Fla. Laws 87; Act of Feb. 17, 1876, No. 128, § 1, 1876
Ga. Laws 112; Act of Apr. 16, 1881, §2, 1881 Ill. Laws 73; Act of Feb.

States banned the sale of guns to persons of unsound mind.[17]  At

least a dozen States disarmed "tramps"—that is, vagrants.[18]  One

_____

27, 1875, ch. 40, § 1, 1875 Ind. Laws 59; Act of Mar. 29, 1884, ch. 78,
§ 1, 1884 Iowa Acts 86; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan.
Sess. Laws 159; Ky. Gen. Stat. ch. 29, Art. 29, § 1, at 359 (Edward I.
Bullock & William Johnson eds., 1873); Act of July 1, 1890, No. 46,
§ 1, 1890 La. Acts 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws
656; Act of June 2, 1883, No. 138, § 1, 1883 Mich. Pub. Acts 144; Act
of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat.
ch. 24, Art. II, § 1274, at 224 (1879); Act of Mar. 2, 1885, ch. 51, § 1,
1885 Nev. Stat. 51; Act of Feb. 10, 1882, ch. 4, §§ 1-2, 1882 N.J. Acts
13-14; Act of May 10, 1883, § 1, ch. 375, 1883 N.Y. Laws 556; Act of
Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468; Act of Mar. 25,
1880, § 1, 1880 Ohio Laws 79-80; Act of June 10, 1881, § 1, 1881 Pa.
Laws 111-112; Act of Apr. 13, 1883, ch. 374, § 1, 1883 R.I. Acts &
Resolves 157; Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92;
Act of 1897, ch. 155, § 1, 1897 Tex. Gen. Laws 221; Act of Nov. 16,
1896, No. 111, § 1, 1896 Vt. Acts & Resolves 83; Act of Nov. 26, 1883,
§ 1, 1883 Laws of the Territory of Wash. 67; Act of Mar. 29, 1882, ch.
135, § 1, 1882 W. Va. Acts 421; Act of Apr. 3, 1883, ch. 329, § 2, 1883
Wis. Sess. Laws, Vol. 1, at 290; Act of Mar. 14, 1890, ch. 73, § 97,
1890 Wyo. Territory Sess. Laws 140.

[17] *See* Act of Feb. 4, 1881, ch. 3285, No. 67, § 1, 1881 Fla. Laws
87; Act of Mar. 5, 1883, ch. 105, § 1, 1883 Kan. Sess. Laws 159; Act of
Feb. 17, 1899, ch. 1, § 52, 1899 N.C. Pub. Laws 20-21.

[18] *See* Act of Mar. 27, 1879, ch. 59, § 4, 1879 Conn. Pub. Acts
394; Act of Mar. 27, 1879, ch. 155, § 8, 16 Del. Laws 225 (1879); Act
of May 3, 1890, ch. 43, § 4, 1890 Iowa Acts 69; Act of Apr. 24, 1880,
ch. 257, § 4, 1880 Mass. Acts 232; Miss. Rev. Code ch. 77, § 2964
(1880); Act of Aug. 1, 1878, ch. 38, § 2, 1878 N.H. Laws 170; Act of
May 5, 1880, ch. 176, § 4, 1880 N.Y. Laws, Vol. 2, at 297; Act of Mar.
12, 1879, ch. 198, § 2, 1879 N.C. Sess. Laws 355; Act of June 12,
1879, § 2, 1879 Ohio Laws 192; Act of Apr. 30, 1879, § 2, 1879 Pa.
Laws 34; Act of Apr. 9, 1880, ch. 806, § 3, 1880 R.I. Acts & Resolves

State forbade the carrying of arms by "any person who has ever borne arms against the government of the United States."[19]  Another disarmed certain individuals in identified categories if they were "not known to be peaceable and quiet persons."[20]

Again, consistent with this wider practice, States forbade intoxicated persons from buying or carrying guns.[21]  Starting at the turn of the century, intoxicants other than alcohol became more prevalent, as did regulation of those intoxicants.  *See e.g.,* 1916 N.J. Laws 275-76, ch. 130, §§ 1-2 (prohibiting entry into the "woods or fields at any time with a gun or firearm when ... under the influence of *any drug*") (emphasis added); Richard J. Bonnie & Charles H. Whitebread, II, *The Forbidden Fruit and the Tree of Knowledge: An*

---

110; Act of Nov. 26, 1878, No. 14, § 3, 1878 Vt. Acts & Resolves 30; Act of Mar. 4, 1879, ch. 188, § 4, 1879 Wis. Sess. Laws 274.

[19] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25.

[20] *See* Act of Apr. 30, 1855, §§ 1-2, in 2 *The General Laws of the State of California, from 1850 to 1864, inclusive* 1076-1077 (Theodore H. Hitchell ed., 1865).

[21] *See* Act of Feb. 23, 1867, ch. 12, § 1, 1867 Kan. Sess. Laws 25; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; 1 Mo. Rev. Stat. ch. 24, Art. II, § 1274, at 224 (1879); Act of Apr. 3, 1883, ch. 329, § 3, 1883 Wis. Sess. Laws, Vol. 1, at 290.

*Inquiry into the Legal History of American Marijuana Prohibition*, 56 VA. L. REV. 971, 985 (1970) (describing increased recreational use of narcotics beginning at the turn of the century). In 1931, Pennsylvania prohibited "deliver[y] of a firearm ... to one who he has reasonable cause to believe ... is a drug addict." Uniform Firearms Act, No. 158, § 8, 1931 Pa. Laws 499. Shortly after, jurisdictions including the District of Columbia, Alabama, California, South Dakota, and Washington barred the sale of firearms to "drug addict[s]." Act of July 8, 1932, ch. 465, § 7, 47 Stat. 650, 652 (D.C.); Act of Apr. 6, 1936, No. 82, § 1936 Ala. Laws 52; 1935 S.D. Sess. Laws ch. 208, § 8, 356; Short Firearms, ch. 172, § 8, 1935 Wash. Sess. Laws 601.

At least 24 states and the District of Columbia "have restricted the right of habitual drug abusers or alcoholics to possess or carry firearms." *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010) (collecting modern statutes).

State courts upheld such laws on the ground that the disqualified individuals were apt to use arms irresponsibly. The Missouri Supreme Court, for example, upheld a ban on carrying

45

arms while intoxicated as a "reasonable regulation" that prevented the "mischief to be apprehended from an intoxicated person going abroad with fire-arms." *State v. Shelby*, 2 S.W. 468,469 (1886). And the Ohio Supreme Court explained that a law disarming "tramps" was consistent with the right to keep and bear arms because that right "was never intended as a warrant for vicious persons to carry weapons with which to terrorize others." *State v. Hogan*, 58 N.E. 572, 575 (1900).

From the earliest days of the Republic to modern times, in short, legislatures have disarmed individuals who could not be trusted with firearms. Different legislatures have disarmed different groups at different times: loyalists and rebels in the 18th century; under-age individuals and persons of unsound mind in the 19th century; and felons, drug addicts, and domestic abusers in the 20th century. That series of statutes reflects Congress's longstanding judgment that "firearms must be kept away from persons . . . who might be expected to misuse them." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 119 (1983).

But those disqualifications all reflect the same enduring principle: The Second Amendment allows Congress to disarm individuals who are not law-abiding, responsible citizens.

### 4. Section 922(g)(3) Complies with the Second Amendment.

As set forth above, the Nation has a lengthy historical tradition of disarming individuals who are not law-abiding, responsible citizens. Section 922(g)(3), which prohibits possession of firearms only by people contemporaneously addicted to or habitually using illegal drugs, is entirely consistent with that tradition.

Congress enacted the original version of § 922(g)(3) as part of the Gun Control Act of 1968, which was a broad effort to "keep firearms away" from certain groups of people "classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218 (1976); *see also Lewis v. United States*, 445 U.S. 55, 64 (1980) (observing that § 922(g) "prohibits categories of presumptively dangerous persons from transporting or receiving firearms"). During congressional debate on the bill, the House Manager proclaimed that "[n]o one can dispute the need to prevent drug addicts . . . from buying, owning, or possessing firearms" in

47

order to "reduc[e] the danger of crime" and protect society from "firearms misuse." *See Huddleston v. United States*, 415 U.S. 814, 828 (1974) (quoting 114 CONG. REC. 21784 (1968) (statement of Rep. Emanuel Celler)); *see also Yancey*, 621 F.3d at 683-84 (finding that section 922(g)(3) addresses "the ease with which any person can anonymously acquire firearms," including "narcotic addicts," which "is a matter of serious national concern") (citing S. Rep. No. 90-1501, at 22 (1968)). These threats are heightened in the context of unlawful drug users because, generally speaking, individuals in this class are more likely to "have difficulty exercising self-control." *See Dugan*, 657 F.3d at 999; *see also* 21 U.S.C. § 802(1) (defining an "addict" as an individual who "habitually uses any narcotic drug so as to endanger the public morals, health, safety, or welfare, or who is so far addicted to the use of narcotic drugs as to have lost the power of self-control with reference to his addiction").

Facing the unprecedented issue of drug abuse, Congress was entitled to disarm individuals contemporaneously addicted to or habitually using illegal drugs. Such individuals are not law-abiding. In Stennerson's case, he admitted using a "shot" or about a gram a

48

day of methamphetamine, the possession of which is a federal crime. *See* 21 U.S.C. § 844. Moreover, what makes the issue of drug abuse unprecedented is the links to additional criminal activity related to financing a drug habit. Here, too, Stennerson is an unfortunate example, engaging in theft and a burglary that ended in a violent encounter with the police. *See* SER-15 (Stennerson's acknowledgement that the explanation for his criminal history was "mainly my drug abuse").

Because restrictions on firearm possession while contemporaneously addicted to or habitually using illegal drugs does not infringe upon the right of law-abiding, responsible citizens to keep and bear arms, § 922(g)(3) does not implicate the Second Amendment. The "proposed course of conduct" at issue for purposes of the *Bruen* analysis, *Alaniz*, 69 F.4th at 1128 (quoting *Bruen*, 142 S.Ct. at 2134-35), is not solely firearm possession, it is firearm possession *while individuals are contemporaneously engaged in habitual illegal and dangerous drug use. See Scarborough v. United States*, 431 U.S. 563, 570 (1977) ("It is obvious that the tenses used throughout [§ 922(g)] were chosen with care."); *Purdy*, 264 F.3d at

49

812 (holding that the government must prove "the defendant took drugs with regularity … contemporaneously with his purchase or possession of a firearm"). Because the regulation burdens only individuals contemporaneously engaged in criminal activity, the right of law-abiding citizens to keep and bear arms is not implicated. *See Dugan*, 657 F.3d at 999 ("[A]n unlawful drug user may regain his right to possess a firearm simply by ending his drug abuse.); *Yancy*, 621 F.3d at 687 ("[T]he Second Amendment … does not require Congress to allow [an individual] to simultaneously choose both gun possession and drug abuse.").

> ### 5. Section 922(g)(3) is relevantly similar to historical laws regulating firearms.

Even if the Second Amendment's text is implicated, however, the restrictions are consistent with the Nation's history of firearms regulation. *Bruen* recognized that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791," and explained that courts should "reason[] by analogy—a commonplace task for any lawyer or judge." *Bruen*, 142 S.Ct. at 2132. As discussed above, a court should ask "how and why the regulations burden a law-abiding citizen's right to armed self-

50

defense." *Id.* at 2133. Put another way, the "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133 (emphasis and quotation marks omitted).

Although the challenges of addressing firearms safety with respect to drug abuse are unprecedented, there are three strands of historical regulations that are implicated.

First, historical precedent abounds that individuals could be disarmed while engaging in illegal activity. Indeed, as just discussed, § 922(g)(3) imposes no "burden [on] a *law-abiding* citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2133. For the reasons just articulated, those contemporaneously engaged in habitual use of illegal drugs are, by definition, not law abiding. As the Court recognized in *Dugan*, the restriction on firearms possession by habitual drug users is "far less onerous" than the lifetime bans on felons because the individual can regain his rights by ceasing his illegal activity. 657 F.3d at 999.

51

Second, historical precedent is clear that the legislature may disarm those who "are more likely to have difficulty exercising self-control, making it dangerous from them to possess firearms." *Yancy*, 621 F.3d at 681. *Heller* expressly identified restrictions on firearm possession by the mentally ill as presumptively valid.[22] *Heller*, 128 S.Ct. at 2816-17. The historical restrictions on firearm possession by the intoxicated, and even restricting situations that threatened to mingle firearms possession and intoxication, grow from the same concern.

Third, and most broadly, "[l]egislatures historically prohibited possession by categories of persons based on a conclusion that the

---

[22] Federal law did not prohibit firearm possession by those adjudicated mentally ill or committed to a mental institution until 1968, *see United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (citing Pub.L. 90-618, 82 Stat. 1213, 1220). But the absence of historical statutory prohibitions on firearm possession may have been the consequence of the fact that "in eighteenth-century America, justices of the peace were authorized to 'lock up' 'lunatics' who were 'dangerous to be permitted to go abroad.'" Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1377 (2009)); *accord* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1361 n. 136.

category as a whole presented an unacceptable risk of danger if armed." *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023). As the history discussed above makes clear, Congress is entitled to assess the dangerousness of individuals—here, those habitually engaged in illegal activity that erodes self-control and increases the risk of crime and firearms misuse—and to restrict firearm possession accordingly. *See Bruen*, 142 S.Ct. at 2132 ("[T]he Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.").

Furthermore, the modern and historical laws are "comparably justified." *Bruen*, 142 S.Ct. at 2133. As both Congress and this Court have recognized, the same risk of firearms misuse drives the prohibition on habitual users of illegal drugs as other historical restrictions. *See Dugan*, 657 F.3d at 999 ("[W]e see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so."); *Jackson*, 69 F.4th at 505 ("Congress prohibited categories of presumptively dangerous persons from transporting or receiving firearms because they posed an unacceptable risk of dangerousness." (quotation marks

53

and citations omitted)).  It seeks to protect society from gun violence committed by those contemporaneously engaged in illegal drug use and can reasonably be considered to be a heightened danger of firearm misuse.

Stennerson's claim that § 922(g)(3) is inconsistent with the nation's history of firearm regulation because it was not enacted until the 20th century (Op. Br. at 27-30) misunderstands *Bruen*'s historical inquiry.  *Bruen* emphasized that the government need only identify a "historical *analogue*, not a historical *twin*." 142 S.Ct. at 2133 (emphasis in original).  "[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check."  *Id.*  As explained above, § 922(g)(3) and the historical laws are "relevantly similar," *id.* at 2132, because the historical laws authorized legislatures to disarm those not obeying the law or otherwise posing risk of misuse of firearms.

Moreover, the lack of an identical historical statute does not suggest that the founding generation would have viewed § 922(g)(3) as violating the Second Amendment.  As one district court recently observed, a "list of the laws that happened to exist in the founding

era is . . . not the same thing as an exhaustive account of what laws would have been theoretically believed to be permissible by an individual sharing the original public understanding of the Constitution." *United States v. Kelly*, No. 3:22-CR-37, 2022 WL 17336578, at *2 (M.D. Tenn. Nov. 16, 2022) (emphasis in original). Founding-era legislatures cannot be presumed to have legislated to the full limits of their constitutional authority.

As noted above, this Court already held that "contemporary concerns regarding drug abuse" are "unprecedented," and call for the "more nuanced approach" *Bruen* instructs in such circumstances. *Alaniz*, 69 F.4th at 1129 (rejecting analogies between illegal drug trafficking and founding-era smuggling crimes). Accordingly, Stennerson's attempt to cabin the relevant precedent to regulations relating to firearm possession while under the influence of alcohol is unduly narrow. Congress was certainly entitled to recognize that the dangers of firearm possession by those contemporaneously and habitually engaged in illegal drug use pose risks beyond simple intoxication. *See Yancy*, 621 F.3d at 686 ("[N]early four times as many adults arrested for serious crimes had used an illegal drug in

55

the previous year than had not.").  Indeed, Congress took the matter to be self-evident: proclaiming that "[n]o one can dispute the need to prevent drug addicts . . . from buying, owning, or possessing firearms" in order to "reduc[e] the danger of crime" and protect society from "firearms misuse."  114 CONG. REC. 21784 (1968) (statement of Rep. Emanuel Celler).  Stennerson's own situation illustrates how not just his drug crimes, but property crimes and an illegal weapons charge, all began "when his substance abuse really, really took off," and was driven by his drug abuse.  SER-13-15.   And, crucially, unlike misuse of alcohol, the habitual use of *illegal* controlled necessarily indicates that the individual either will not or cannot stop engaging in illegal activity, conduct that puts them beyond the protections of the Second Amendment.

Finally, Stennerson simply ignores the clear instruction of both the Supreme Court and this Court that the question at *Bruen* step two is the comparison between historic and modern regulation as to "how and why the regulations burden *a law-abiding citizen's* right to self-defense." *Alaniz*, 69 F.4th at 1128.  Stennerson make no effort to show that § 922(g)(3) imposes a greater burden on law-abiding

citizens' firearm possession than regulations addressing other groups deemed dangerous or excludable from the political community. As the Eighth Circuit explained in *Jackson*, 69 F.4th at 504, whether the historic record is viewed as allowing disqualification based on the threat posed to an orderly society and compliance with legal norms, or based on risk of dangerousness, disarming those that have committed serious crimes are relevantly analogous: "Legislatures historically prohibited possession by categories of people based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed," and "[i]n reasoning by analogy from that history, 'the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.'" *Id.* (quoting *Bruen*, 142 S.Ct. at 2132).

As this Court has already concluded in *Dugan*, § 922(g)(3) is justified by the risk of crime and firearms misuse by habitual users of illegal drugs comparable to fears that have motivated excluding other groups from firearms possession. Moreover, the restriction imposes *no* burden on the firearm rights of law-abiding citizens because it restricts only those contemporaneously habitually using

57

illegal drugs. To the extent it imposes any burden, it is one that can be restored "simply by ending [the user's] drug abuse." *Dugan*, 657 F.3d at 999.

## II. Stennerson cannot show the United States' prohibition on receipt of a firearm by a person under felony indictment is unconstitutional.

It is well-established that, upon a finding of probable cause, those accused of serious crimes are subject to substantial liberty restrictions, including pre-trial detention. Consistent with this tradition, the prohibition on receipt of a firearm while under indictment, 18 U.S.C. § 922(n), does not infringe on the right to bear arms. First, because the statute does not burden the rights of "law-abiding, responsible citizens," the Second Amendment is not implicated. Even considering the Second Amendment, however, the limited restriction is similarly justified and much less of a burden than the Nation's history of restrictions on those pending trial and is similarly justified by Congress's authority to impose firearm restrictions on groups that pose a risk of firearm misuse.

### A. The Nation has a well-established history of liberty restrictions on those pending trial for serious criminal offenses.

Since the English Bill of Rights was enacted, the government has been able to detain those accused of serious crimes—whether violent or not—before trial. *Carlson v. Landon*, 342 U.S. 524, 545-46 (1952). "In felonies," according to Blackstone, "no bail [could] be a security equivalent to the actual custody of the person." 4 William Blackstone, Commentaries on the Laws of England 296. In non-felony cases, Parliament had authority to mandate that those accused of certain crimes be detained before trial. *Id.* at 297. "Taken together, English practice suggests that a person under felony indictment had no fundamental right to bail, but he could be released based on an individual assessment in some cases." *United States v. Alston*, No. 5:23-CR-021, 2023 WL 4758734, at *9 (E.D.N.C. July 18, 2023).

In America, the Judiciary Act of 1789 created a statutory right to bail "except where the punishment may be death." Ch. 20, § 33, 1 Stat. 73, 91. And, while the Eighth Amendment prohibits excessive bail, it "fails to say all arrests must be bailable." *Carlson*, 342 U.S. at

546; *Salerno*, 481 U.S. at 754 ("The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil.").

A number of restrictions on liberty follow from this tradition of arrest and pretrial detention. A citizen cannot be arrested on felony charges absent a showing of probable cause to believe he has not abided by the law. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *United States v. Watson*, 423 U.S. 411, 415-416 (1976). Once probable cause is established, however, the suspected lawbreaker "may face substantial liberty restrictions." *Salerno*, 481 U.S. at 749. He may be searched incident to his arrest. *United States v. Robinson*, 414 U.S. 218, 224-226 (1973). He may be strip searched once taken to jail. *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 322-323 (2012). He may be temporarily jailed pending arraignment based upon the government's "strong interest" in protecting the public from those "reasonably suspected of having engaged in criminal activity, even where there has been no opportunity for a prior judicial adjudication." *County of Riverside v. McLaughlin*, 500 U.S. 44, 52

60

(1991). In some circumstances, a person charged with a crime can be denied bail and detained pending trial with his assets frozen, precluded from hiring Sixth Amendment counsel of choice. *Salerno*, 481 U.S. at 739; *Kaley v. United States*, 571 U.S. 320 (2014). Despite the First Amendment freedoms of speech and the press, those detained can be prohibited from receiving books and magazines from private parties. *Bell v. Wolfish*, 441 U.S. 540, 549-552 (1979).

Given that the needs of the criminal justice system can justify all these substantial restrictions and outweigh a criminal defendant's First, Fourth, Fifth, and Sixth Amendment rights, they can likewise outweigh a criminal defendant's Second Amendment rights. See *Bruen*, 142 S.Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights."); *id.* at 2156 (emphasizing the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees"). Thus, if an information found to be supported by probable cause is sufficient to trigger detention, *see Salerno*, 481 U.S. at 739; a seizure of assets, *see Kaley*, 571 U.S. at 327-328; and First Amendment restrictions, *see Bell*, 441

61

U.S. at 550; it is also sufficient to temporarily restrict the right to acquire firearms.

Section 922(n), which makes it illegal for anyone "under indictment for a crime punishable by imprisonment for a term exceeding one year" to ship, receive, or transport a firearm of ammunition, imposes only a relatively limited burden on any constitutional liberty.[23]

## B. Section 922(n) does not burden the right of law-abiding, responsible citizens to keep and bear arms.

As discussed previously, the Supreme Court has repeatedly addressed the Second Amendment as a "right," belonging to "law-

---

[23] The statute's precursors date back to the 1938 Federal Firearms Act, which barred individuals under federal indictment for a crime of violence from shipping firearms in interstate commerce. 5 Cong. Ch. 850, § 2(e). That act was aimed to "combat roaming criminals crossing state lines." *United States v. Quiroz,* 629 F. Supp. 3d 511, 517 (W.D. Tex. 2022). In 1968, Congress passed the Gun Control Act of 1968 "to provide support to Federal, State, and local law enforcement officials in their fight against crime and violence." Pub. L. No. 90-618, § 101. That statute outlawed the receipt of a firearm by any individual under felony indictment—state or federal. Congress then combined all prohibitions against persons under indictment into what is now § 922(n). *Alston,* 2023 WL 4758734, at *8.

62

abiding, responsible citizens." *Heller*, 554 U.S. at 635; *see also*
*Bruen*, 142 S.Ct. at 2111 (describing the "right of an ordinary law-
abiding citizen to possess a handgun" both publicly and in the home
"for self-defense"). The Court has framed its analysis of the burden
of firearm regulations by "how and why the regulations burden *a
law-abiding citizen's* right to armed self-defense." *Id.* at 2133
(emphasis added).

Because 18 U.S.C. § 922(n) imposes restrictions only following
an indictment based on probable cause of a serious offense it does not
burden the rights of a law-abiding citizen. This Court has affirmed a
district court order reaching a similar conclusion. *United States v.
Fencl*, No. 21-CR-3101, JLS, 2022 WL 17486363, at *2 (S.D. Cal. Dec.
7, 2022), *aff'd* No. 22-50316 (9th Cir. Jan 26, 2023) (opinion to
follow). In *Fencl*, the court held that pretrial release conditions
barring gun possession, 18 U.S.C. § 3142(c)(1)(B)(viiii), do not violate
the Second Amendment. *Id.* The court reasoned the defendant fell
outside the amendment's scope because "he has been charged with
unlawful possession of firearms based on a finding of probable
cause." *Id.* It rejected an appeal to the presumption of innocence,

explaining this presumption "does not deprive the government of the ability to place significant, but temporary, restrictions on an accused's constitutional rights in order to further its interest in community safety." *Id.* (citing *Salerno*, 481 U.S. at 748).

Stennerson and others facing pending felony charges are not law-abiding, responsible citizens, and the Second Amendment does not preclude the government from imposing firearm restrictions on that class of individuals.

## C. Section 922(n) is consistent with the Nation's historical tradition of gun regulation.

Twin distinct historical threads sustain the restrictions Section 922(n) imposes on those with pending felony charges: (1) liberty restrictions on indicted defendants, including pretrial detention, and (2) laws restricting the gun rights of groups deemed dangerous or untrustworthy to obey the law.

First, as explained above, legislatures can, consistent with the Constitution, deprive indicted defendants of their liberty. Legislatures retain the power to "defin[e] the classes of cases in which bail shall be allowed." *Carlson*, 342 U.S. at 546. Indeed, if it

chose, "Congress may ban bail in an entire class of cases." *United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010).

The historical tradition of detaining those charged with serious crimes supports § 922(n)'s restriction on those individuals' right to receive guns. The power to detain necessarily encompasses the power to impose lesser liberty restrictions. Cf. *Kaley*, 571 U.S. at 330 (reasoning that "it would be odd to conclude" that the government cannot seize forfeitable assets on a grand jury's probable-cause finding when "that showing is often sufficient to restrain persons" (cleaned up)); *Stephens*, 594 F.3d at 1039 (reasoning that Congress's power to ban bail in some cases implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" requiring a curfew and electronic monitoring). And, no one questions, of course, the authority of the government to restrict gun possession by those held in pretrial detention.

Accordingly, limiting receipt of firearms while under indictment imposes a much more minimal burden on the right to bear arms than the historically permissible exclusion of bail entirely

65

(and, accordingly, *any* gun possession). The regulation is also

similarly justified. As one district court explained:

> [B]oth the historical practice of pretrial detention
> and § 922(n) find their justification from the same source: a
> grand jury's formal accusation that there is probable cause to
> believe the defendant committed a serious crime. That
> accusation—memorialized by an indictment—fundamentally
> alters the relationship between the state and the accused. The
> most extreme effect of an indictment is that it allows the state
> to "immediately depriv[e] the accused of her freedom." *Kaley*,
> 571 U.S. at 329. And if an indictment can justify a total and
> immediate deprivation of liberty, it also justifies lesser
> deprivations—like limiting a defendant's ability to ship,
> transport, or receive a firearm. *See id.*

*Alston*, 2023 WL 4758734 at *10.

Second, as explained in detail above, historical precedent

makes clear that legislatures are empowered to impose firearm

limitations on those deemed dangerous. The tradition of disarming

dangerous or untrustworthy persons supports § 922(n)'s ban on

indicted defendants' receipt of firearms. Section 922(n) is "relevantly

similar" to these historical precursors under the "two metrics" *Bruen*

offered: "how and why the regulations burden" Second Amendment

rights. *Bruen*, 142 S.Ct. at 2132-2133. As to "how" the statute

operates, § 922(n), like those precursors, uses an objective criterion

to categorically restrict a specific group's gun rights. As to "why,"

§ 922(n) seeks "to combat violence and promote public safety" by "keeping firearms out of the hands of categories of potentially irresponsible persons." *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011) (ellipses omitted). Section 922(n) thus represents a permissible legislative judgment that a person's status as an indicted felon warrants temporarily precluding the person from acquiring new firearms.

Importantly, § 922(n) creates only a limited, if any, burden on Second Amendment rights. Section 922(n) does not burden that right because it "does not prohibit *possession* of a weapon." *Laurent*, 861 F. Supp. 2d at 85. Section 922(n) did not impair Stennerson's ability to "keep" any arms he had before his indictment. Rather, he simply could not receive new ones during the time he was under indictment. To the extent to which a temporary restriction on the timing of "receiving" a firearm implicates the Second Amendment, it is limited by the fact that obtaining a gun while under indictment poses distinct risks because Congress could reasonably "infer a malevolent intent when an indictee finds it necessary to obtain a gun during the narrow period during which an indictment is pending

knowing that he will have to give it up should he be convicted."

*United States v. Khatib*, NO. 12-CR-190, 2012 WL 6086862, at *4

(E.D. Wis. Dec. 6, 2012).

### III. Section 922(g)(3) is not unconstitutionally vague.

As the district court explained, "the Ninth Circuit has

articulated well-established legal standards for analyzing a void-for-

vagueness claim." ER-49. Much of this case law was articulated

expressly with respect to 18 U.S.C. § 922(g)(3) and its forebearers.

*See Purdy*, 264 F.3d at 811 ("Where, as here, a statute is challenged

as unconstitutionally vague in a cause of action not involving the

First Amendment, we do not consider whether the statute is

unconstitutional on its face."); *United States v. Ocegueda*, 564 F.2d

1363, 1365 (9th Cir. 1977).

The Ninth Circuit has made clear that "unlawful user" was not

unconstitutionally vague where the user took illegal drugs "with

regularity, over an extended period of time, and contemporaneously

with his purchase or possess of a firearm," and those facts were

sufficient to put him on notice that he fell within in the statutory

definition. *Purdy*, 264 F.3d at 812-13. As the district court

explained, while an as-applied challenge to the statute is premature,[24] Stennerson's admissions demonstrate regular, extended drug use contemporaneous with his firearm possession. ER-29. Stennerson contemporaneously admitted to using a "shot of" methamphetamine every day, he had previously admitted being an addict, and had a pending 2018 possession of methamphetamine charge. *Id.* This regular, prolonged, and contemporaneous drug use was sufficient to put Stennerson on notice that he fell within the statutory definition of "unlawful drug user."

Stennerson notes that recent Supreme Court cases have entertained facial challenges with respect to statutes requiring categorical analysis without requiring a showing that the statute was vague as applied to the individual. (Op. Br. 34 (citing *Johnson v. United States*, 576 U.S. 591, 603 (2015); *Sessions v. Dimaya*, 138 S. Ct. 1204, 1214 (2018); *United States v. Davis*, 139 S. Ct. 2319, 2336

---

[24] *See, e.g.*, *United States v. Turner*, 842 F.3d 602, 605 (8th Cir. 2016) (holding that "the district court could not rule on [the defendant's] as applied constitutional challenge without resolving factual issues related to his alleged offense, such as the extent of his drug use, and therefore the court should have deferred the ruling until trial").

69

(2019)). Those cases, however, address vagueness in a different area of law and are not irreconcilable with *Purdy*. As multiple circuits have recognized "*Johnson* and *Dimaya* did not alter the general rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge." *United States v. Hasson*, 26 F.4th 610, 620-21 (4th Cir. 2022) (quoting *United States v. Cook*, 970 F.3d 866, 877 (7th Cir. 2020)). As the Seventh Circuit explained in *Cook*, the Supreme Court clearly distinguished the vagueness at issue in *Johnson*, which "requires application of the 'serious potential risk' standard to an idealized ordinary case of the crime," from statutes, like § 922(g)(3) that merely apply a qualitative standard of substantial risk to "real-world conduct." 970 F.3d at 876. Accordingly, "[a]ssessing the degree of risk posed by an idealized 'typical' version of an offense was significantly different . . . from looking at the risks posed by a set of actual, concrete facts." *Id.*

As the Seventh Circuit explained, challenges to § 922(g)(3) "present[] a much more routine vagueness challenge" that "does not call for the court to engage in any abstract analysis; it calls on the

70

court to apply the statutory prohibition to a defendant's real-world conduct." *Id.* at 876-77; *see Purdy*, 264 F.3d at 811 ("[O]ur concern is whether the [statute] is impermissibly vague *in the circumstances of this case.*" (emphasis in original)). Accordingly, nothing in *Johnson* is clearly irreconcilable with binding circuit precedent that facial challenges to 18 U.S.C. § 922(g)(3) are inappropriate.

Moreover, Stennerson ignores that the Ninth Circuit has repeatedly articulated—unlike the Supreme Court's holding in the categorical approach cases—there *is* an obvious core of conduct proscribed by the statute—one that Stennerson's conduct falls within. As the district court stated, "[t]he Ninth Circuit agrees that the statute requires regular and habitual use at the time of gun possession. . . . [A]ny uncertainty about the statute's application to a hypothetical defendant's conduct is a marginal case that does not render the statute unconstitutionally vague on its face." ER-29.

## CONCLUSION

The district court should be affirmed.

/ / /

/ / /

71

DATED this 12th day of January, 2024.

Respectfully submitted,

JESSE A. LASLOVICH
United States Attorney

s/ *Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant United States
Attorney

## STATEMENT OF RELATED CASES

There are no related cases.

DATED this 12th day of January, 2024.

> JESSE A. LASLOVICH
> United States Attorney
>
> s/ *Timothy A. Tatarka*
> TIMOTHY A. TATARKA
> Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and the body of the argument contains 13,981 words.

DATED this 12th day of January, 2024.

JESSE A. LASLOVICH
United States Attorney

s/ *Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

JESSE A. LASLOVICH
United States Attorney

s/ *Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant United States Attorney