No. 23-1439

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

**UNITED STATES OF AMERICA**,
PLAINTIFF-APPELLEE,

V.

**JAREN MICHAEL STENNERSON**,
DEFENDANT-APPELLANT.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
D.C. NO. CR-22-139-BLG-SPW

————————————

**SUPPLEMENTAL BRIEF OF THE UNITED STATES**

————————————

JESSE A. LASLOVICH
United States Attorney

TIMOTHY A. TATARKA
Assistant U.S. Attorney
District of Montana
2601 2nd Avenue North
Suite 3200
Billings, MT 59101
Telephone: (406) 657-6101

Attorneys for Appellee

# TABLE OF CONTENTS

Table of Contents ............................ **Error! Bookmark not defined.**

Table of Authorities ................................................................ii

   I. *Rahimi* demonstrates that pre-*Bruen* Ninth Circuit authority is not clearly irreconcilable with *Bruen*. .................. 1

   II. *Rahimi* clarified the high standard applied to facial challenges to the constitutionality of a congressionally enacted statute. ............................... 3

   III. *Rahimi*'s analysis confirms that temporarily banning firearm possession by individuals addicted to illegal drugs is consistent with the nation's history of regulating firearm possession by those presenting special dangers of misuse. ...................... 4

   IV. *Rahimi*'s analysis confirms that temporarily banning receipt of firearms by those under felony indictment is consistent with the nation's history of disarming pretrial detainees. ................................. 12

Conclusion ................................................................... 15

Statement of Related Cases ............................................... 17

Certificate of Compliance ................................................ 18

Certificate of Service ...................................................... 19

# TABLE OF AUTHORITIES

## Cases

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .................................................................. 1, 4, 5

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ........................................................ 10

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    597 U.S. 1 (2022) ................................................................... 5, 10, 15

*United States v. Alaniz,*
    69 F.4th 1124 (9th Cir. 2023) ....................................................... 10

*United States v. Alston,*
    No. 5:23-CR-021, 2023 WL 4758734 (E.D.N.C. July 18, 2023) ...... 14

*United States v. Black,*
    CR No. 22-133-1, 2024 WL 3656226 (W.D. La. Aug. 5, 2024) .......... 5

*United States v. Daniels,*
    77 F.4th 337 (5th Cir. 2023) ........................................................... 5

*United States v. Dugan,*
    657 F.3d 998 (9th Cir. 2011) ................................................... 1, 2, 11

*United States v. Fencl,*
    No. 21-CR-3103, 2022 WL 17486363 (S.D. Cal. Dec. 7, 2022) ....... 13

*United States v. Perez-Garcia,*
    96 F.4th 1166 (9th Cir. 2024) ................................................. passim

*United States v. Purdy,*
    264 F.3d 809 (9th Cir. 2001) ......................................................... 11

*United States v. Rahimi,*
    144 S. Ct. 1889 (2024) ........................................................... passim

*United States v. Rowson,*
    652 F. Supp.  (S.D.N.Y 2023) .................................................... 7, 15

*United States v. Salerno*,
   481 U.S. 739 (1987) ................................................................3, 4

*United States v. Vangdy*,
   No. 23-10027-JWB, 2024 WL 3400255 (D. Kan. July 12, 2024) ......5

*United States v. Youngblood*, __ F. Supp. 3d __, 2024 WL 3449554,(D.
   Mont. 2024)................................................................................5, 10

## <u>Statutes</u>

18 U.S.C. § 922(g)(3) ........................................................................1, 5

18 U.S.C. § 922(n) ...............................................................................15

## <u>Rules</u>

Fed. R. App. P. 32(a)(7)(C) .................................................................18

## <u>Other Authorities</u>

W. Hawkins, Pleas of the Crown ...........................................................7

Developments in Second Amendment jurisprudence in both the Supreme Court and this Court have strengthened the position that Congress retained constitutional authority to temporarily ban firearms possession or receipt by narrow categories of persons who pose a special danger of misuse, including those contemporaneously engaged in criminal drug use or under felony indictment.

**I.** *Rahimi* **demonstrates that pre-***Bruen*** Ninth Circuit authority is not clearly irreconcilable with** *Bruen***.**

As the United States referenced in its answering brief, this Court's precedent holds that 18 U.S.C. § 922(g)(3) does not violate the right to bear arms. Ans. Br. at 11-22 (citing *United States v. Dugan*, 657 F.3d 998 (9th Cir. 2011)). Stennerson argued that this precedent was irreconcilable with *Bruen*. Op. Br. at 20 n.2. The Supreme Court in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), however, reiterated that "many...prohibitions" of firearm possession, "like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful[,]'" *id.* at 1902 (citing *District of Columbia v. Heller*, 554 U.S. 570, 626, 627, n.26 (2008)), confirming the views of the *Bruen* concurrences, *see* Ans. Br. at 18.

1

*Rahimi* also clarified that "the appropriate analysis" under *Bruen* "involves considering whether the challenged regulation is consistent with *the principles* that underpin our regulatory tradition," not seeking a "historical twin." *Rahimi*, 144 S. Ct. at 1898, 1903 (emphasis added). This defeats any contention that *Dugan* is irreconcilable with *Bruen* because it failed to identify a particular pre-ratification analogue. *Dugan* anticipated *Rahimi* by focusing on the nation's tradition of how and why "relevantly similar" regulations burdened the right to bear arms: (1) explaining "we see the same amount of danger in allowing habitual drug users to traffic in firearms as we see in allowing felons and mentally ill people to do so"; and (2) explaining that the burden imposed by § 922(g)(3) is "far less onerous" than those permanent restrictions. 657 F.3d at 999.

The various concurrences and the dissent in *Rahimi* demonstrate that reasonable jurists can disagree about how to interpret what constitutes the nation's "historical tradition of firearms regulation." *Compare* 144 S. Ct. at 1916 (Kavanaugh, J., concurring) ("Post-ratification interpretations and applications by government actors—at least when reasonably consistent and

longstanding—can be probative of the meaning of vague constitutional statutes."), *with id.* at 1924 (Barrett, J., concurring) (contending that "[h]istory (or tradition) that long postdates ratification does not serve th[e] function" of "illuminat[ing] the meaning of the enacted law"). Thus, *Dugan*'s reliance on "the presumed constitutionality of longstanding regulatory measures" that the Supreme Court "recognized" as "categories of traditional exceptions to the right," *id.* at 1923 (Kavanaugh, J., concurring), and drawing principles from those categories to determine how and why regulations are relevantly similar, *id.* at 1898, cannot be clearly irreconcilable with subsequent precedent validating such analysis.

## II. *Rahimi* clarified the high standard applied to facial challenges to the constitutionality of a congressionally enacted statute.

Given that both of Stennerson's Second Amendment challenges are facial, *Rahimi*'s guidance on the limitations of such challenges is especially instructive. To prevail on a facial challenge, "the Government need only demonstrate that [the challenged law] is constitutional in some of its applications." *Rahimi*, 144 S. Ct. at 1898 (citing *United States v. Salerno*, 481

U.S. 739, 745 (1987)). *Rahimi* expressly warned that, "[w]hen legislation and the Constitution brush up against each other, [a court's] task is to seek harmony, not manufacture conflict." *Id.* at 1903. Courts must "consider the circumstances in which [the regulation at issue] is most likely to be constitutional," rather than hypotheticals allowing the court to "slay[] a straw man." *Id.* The Court counselled against focusing on "hypothetical faults" that may "sound in due process rather than the Second Amendment." *Id.* n.2.

**III. *Rahimi*'s analysis confirms that temporarily banning firearm possession by individuals addicted to illegal drugs is consistent with the nation's history of regulating firearm possession by those presenting special dangers of misuse.**

As *Rahimi* recognized, "[a]t the founding, the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers." 144 S. Ct. at 1897; *see* Ans. Br. at 31-32. "[T]he right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose whatsoever." *Id.* (quoting *Heller*, 554 U.S. at 626). Accordingly, courts "examine our historical tradition of

4

firearms regulation to help delineate the contours of the right." *Id.* (quoting *Bruen*, 597 U.S. at 17).

This analysis is not new; however, *Rahimi* explained that "some courts have misunderstood the methodology of our recent Second Amendment precedent."[1] 144 S. Ct. at 1897. The Court was emphatic that the law is not "trapped in amber...the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* It is error to "read *Bruen* to require a 'historical twin' rather than a 'historical analogue.'" *Id.* at 1903 (quoting *Bruen*, 597 U.S. at 30).

Accordingly, "the appropriate analysis involves considering whether the challenged regulation is consistent with *the principles*

---

[1] Stennerson's brief relies on the Fifth Circuit's opinion in *Rahimi*, Op. Br. at 21, 30, and even more heavily on *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), Op. Br. at 24, 27, 30. *Daniels* reflected the same analysis rejected in *Rahimi* and was itself vacated by the Supreme Court. __ S. Ct. __, 2024 WL 3259662 (2024). Every court to address 18 U.S.C. § 922(g)(3) since *Rahimi* has found the statute constitutional, including a Fifth Circuit district court. *United States v. Black*, CR No. 22-133-1, 2024 WL 3656226 at *1 (W.D. La. Aug. 5, 2024); *United States v. Youngblood*, __ F. Supp. 3d __, 2024 WL 3449554, at *5 (D. Mont. 2024); *United States v. Vangdy*, No. 23-10027-JWB, 2024 WL 3400255, at *1 (D. Kan. July 12, 2024).

that underpin the Nation's regulatory tradition." *Rahimi*, 144 S. Ct. at 1898 (emphasis added). The challenged law must only be "relevantly similar to the laws [the United States'] tradition is understood to permit" to be constitutional. *Id.* To hold otherwise would run counter to the Court's explicit guidance in *Rahimi*.

The principle at issue here was recently articulated by this Court: "the Anglo-American right to keep and bear arms for self-defense has always coexisted with legislative authority to disarm groups or individuals whose possession of firearms would pose an unusual danger, beyond the ordinary citizen, to themselves or others." *United States v. Perez-Garcia*, 96 F.4th 1166, 1198 (9th Cir. 2024); *cf. Rahimi*, 144 S. Ct. at 1901 ("[W]e do not suggest that the Second Amendment prohibits the enactment of laws banning possession of guns by categories of persons thought by a legislature to present a special danger of misuse."). Under this analysis, Section 922(g)(3)'s limited burden on firearm possession by active criminal drug users is constitutional. *See* Ans. Br. at 46.

As *Rahimi* notes, "[f]rom the earliest days of the common law, firearms regulations have included provisions barring people from

misusing weapons to harm or menace others," including seizing arms in the possession of any person "judge[d] dangerous to the Peace of the Kingdome." 144 S. Ct. at 1899. This included disarming those engaging in criminal activity, such as "brigands and highwaymen." *Id.* It also included restrictions on those "suspected of future misbehavior."[2] *See id.* at 1900. As discussed in the United States' brief, one area in which potential misuse of firearms was regulated was in relation to alcohol use. Ans. Br. at 31-32; *see also Rahimi*, 144

---

[2] Importantly, while *Rahimi* understandably focused on surety and "going armed" laws as they relate to threatening behavior, the laws sweep in potential "misuse of firearms" more broadly. 144 S.Ct. at 1900. Massachusetts provided for the arrest of "all affrayers, *rioters, disturbers or breakers of the peace*" as well as those who "go armed offensively," and empowered justices of the peace to "seize and take way [their] armour or weapons." Acts and Laws Passed by the Great and General Court of Assembly of Their Majesties Province of the Massachusetts-Bay, 2d Sess., 52–53 (1692), *available at* https://archives.lib.state.ma.us/bitstream/handle/2452/118706/1692ac ts0018.pdf?sequence=4 & isAllowed=y (visited Aug. 8, 2024); *see United States v. Rowson*, 652 F. Supp. 436 (S.D.N.Y 2023) (discussing such laws in the context of Section 922(n)). Commentary from this period in England emphasizes the broad discretion of magistrates to take surety "of all those whom he shall have just cause to suspect to be dangerous,…and of eve-droppers, and common drunkards, and all other persons, whose misbehavior may reasonably be intended to bring them within the meaning of [the Justice of the Peace Act of 1361], as persons of evil fame." 2 W. Hawkins, Pleas of the Crown, ch. 61, § 4, p. 14 (7th ed. 1795).

S. Ct. at 1897 (noting colonial regulation of "gun use by drunken New Year's Eve revelers"). This longstanding tradition continued unquestioned into the Nineteenth and Twentieth centuries, along with legislation restricting gun possession by those of unsound mind and those posing other dangers.[3] *See* Ans. Br. 44-45. Also, as discussed in *Rahimi*, laws targeting individuals "going armed" with dangerous weapons "to terrify the good people of the land" passed muster because "such conduct disrupted the public order and led almost necessarily to actual violence." 144 S. Ct. at 1901 (quotation marks and alterations omitted). These laws "confirm what common sense suggests," *id.*, when an individual poses a special danger of misusing firearms—including those engaging in crimes, using intoxicants, or of unsound mind—she may be temporarily disarmed.

---

[3] This is crucial evidence because "the widespread and long-accepted practices of the American people are the best indication of what fundamental beliefs [a constitutional text] was intended to enshrine." *Rahimi*, 144 S.Ct. at 1918 (Kavanaugh, J., concurring); *id.* at 1923 (explaining that the Court has recognized prohibitions on firearm possession by the mentally ill as "longstanding"). The continued history also serves as a corrective to the "flawed assumption" that "founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring).

8

Section 922(g)(3) is "by no means identical" to founding era alcohol regulations or the other laws referenced, "but it does not need to be." *Rahimi*, 144 S. Ct. at 1901. It is relevantly similar to these laws in why and how it burdens the right.

Because Section 922(g)(3) restricts gun possession only by those contemporaneously engaged in illegal drug use, it "does not broadly restrict arms use by the public generally." *Id.* Moreover, Congress and courts have recognized that the dangers posed by illegal drug addicts with firearms involve not only the danger of misuse while intoxicated (paralleling traditional laws restricting gun possession while intoxicated or of unsound mind), but also the special danger of other criminal activity to feed their addiction. *See* Ans. Br. at 51-53; SER-13-15 (recognizing that Stennerson's criminal activity began "when his substance abuse really took off"). This latter concern is analogous to the one that motivated the surety and "going armed" laws discussed in *Rahimi*. While "not identical" to Section 922(g)(3), both regimes focused on disarming individuals who pose a special risk of illegal activity that made firearms possession particularly dangerous. *See also Perez-Garcia*, 96 F.4th at 1189 (citing extensive

9

historical analysis to conclude "founding-era legislatures categorically disarmed groups whom they judged to be a threat to public safety" (quoting *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J. dissenting)).

Equally importantly, the burden that Section 922(g)(3) "imposes on the right to bear arms also fits within our regulatory system." *Rahimi*, 144 S. Ct. at 1901. Because Section 922(g)(3) restricts only those contemporaneously engaged in illegal activity, it imposes little to no "burden [on] a *law-abiding* citizen's right to armed self-defense." *See Bruen*, 142 S. Ct. at 2133 (emphasis added). This is, of course, narrower than laws that "disarmed individuals during the period of their dangerous intoxication from alcohol use *even though alcohol was legal at the time*." *Youngblood*, 2024 WL 3449554, at *4 (emphasis added). And, while Section 922(g)(3) is not limited to the period of intoxication, "it makes sense that the founding era laws disarming drunk people are different than modern laws disarming users of controlled substances like methamphetamine and fentanyl." *Id.*; *United States v. Alaniz*, 69

F.4th 1124, 1129 (9th Cir. 2023) (recognizing that "contemporary concerns regarding drug abuse" are "unprecedented").

Importantly, like those in *Rahimi*, 144 S. Ct. at 1902, the restriction on firearm possession here is temporary. As this Court has recognized, "an unlawful drug user may regain his right to possess a firearm simply by ending his drug abuse." *Dugan*, 657 F.3d at 999. Moreover, Section 922(g)(3) may only be enforced if individuals are put "on notice that [they fall] with in the statutory definition of 'unlawful [drug] user,'" proved by showing use was with "regularity, over an extended period of time."[4] *United States v. Purdy*, 264 F.3d 809, 812-13 (9th Cir. 2001).

*Rahimi* serves as an important correction to errors in Stennerson's analysis. First, the Court rejects any heightened

---

[4] Although the surety laws addressed in *Rahimi* involved an advanced finding of dangerousness, the Court was clear not to suggest that legislatures were prohibited from banning possession by categories of individuals presenting a special danger of misuse. 144 S.Ct. at 1901. This Court has so held: "Congress today, like the founding era legislatures [referenced in the case], retains the power to disarm narrow segments of the population whom it deems a threat to public safety." *Perez-Garcia*, 96 F.4th at 1189. With respect to Section 922(g)(3), there is no question of notice, individuals need only abstain from activity that is *already* criminal to retain full rights.

"distinctly similar" test, which Stennerson contends applies because "firearm violence committed by intoxicated individuals" was a problem that existed in 1791. *See* Op. Br. at 22-23. Similarly, *Rahimi*'s analysis exposes the fallacy that because "regulations barring users of intoxicants from using or possessing guns were narrowly limited to while they were under the influence," they are not relevant precedents. Op. Br. at 27. This fails to recognize both that it is unnecessary to find a "historical twin," and the unique modern dangers Congress is enabled to redress. As *Rahimi* suggests, ignoring the danger posed by a modern meth addict versus a colonial applejack drinker "would be as mistaken as applying the protections of the right only to muskets and sabers." 144 S. Ct. at 1898.

**IV. *Rahimi*'s analysis confirms that temporarily banning receipt of firearms by those under felony indictment is consistent with the nation's history of disarming pretrial detainees.**

The analysis with respect to Section 922(n) is considerably simplified by the Court's recent decision in *United States v. Perez-Garcia*, which held that temporarily barring possession of firearms by pretrial detainees under the Bail Reform Act is consistent with the nation's historical tradition of firearms regulation. 96 F.4th at

1166; *see* Ans. Br. at 63-64 (discussing the companion case *United States v. Fencl*, No. 21-CR-3103, 2022 WL 17486363 (S.D. Cal. Dec. 7, 2022), *aff'd* No. 22-50316 (9th Cir. Jan. 26, 2023)).

The Court recognized that "[s]ince the founding, the government has been empowered to detain criminal defendants while they await trial," and "[p]retrial detention in the founding era involved total disarmament." *Perez-Garcia*, 96 F.4th at 1182-83. Drawing "the principles that underpin th[is] regulatory tradition," *Rahimi*, 144 S. Ct. at 1898, this Court concluded "the historical record evinces a historical tradition of complete disarmament of criminal defendants facing serious or felony charges pending trial." *Perez-Garcia*, 96 F.4th at 1184.

The Court found the Bail Reform Act relevantly similar because it imposes a comparable burden ("both the modern restriction and its historical precursor allow for complete but temporary disarmament on a narrow subset of the population: criminal defendants awaiting trial for their alleged, serious crimes") and comparably justified ("protecting the public from future criminal acts of the accused defendant"). *Id.* The Court rejected, anticipating *Rahimi*, the

13

argument that the government had to identify a historical precedent that would have restricted individuals in appellants' situation: "The historical tradition of pretrial disarmament allows legislatures to disarm people who are facing serious charges *today*, regardless of whether laws disarming those same exact persons happen to exist in the founding era." *Id.* at 1186.

While the two regulations are not identical—Section 3142(c)(1)(B)(viii) is broader than Section 922(n) in that it permits a ban on firearm possession, not just receipt, but narrower in that it requires a judicial determination—*Perez-Garcia*'s analysis governs here. Section 922(n), which bars only receipt of new firearms, imposes a more limited burden on gun rights than its "historical precursor[s] allow[ing] for complete but temporary disarmament." 96 F.4th at 1184. Moreover, as *Rahimi* addressed with respect to the "going armed" laws, "if imprisonment was" a permissible restriction under the founding era, "then the lesser restriction of temporary disarmament . . . is also permissible." 144 S. Ct. at 1902. The regulation is also similarly justified. *See* Ans. Br. at 66 (quoting *United States v. Alston*, No. 5:23-CR-021, 2023 WL 4758734, at *10

14

(E.D.N.C. July 18, 2023)) ("[B]oth the historical practice of pretrial detention and § 922(n) find their justification from the same source: a grand jury's formal accusation that there is probable cause to believe the defendant committed a serious crime."); *id.* at 62 n.23 (discussing the history and rationale of § 922(n)); *see also Rowson*, 652 F. Supp. 3d at 467 ("Section 922(n) imposes a partial limit on firearms rights of a group of persons defined by an objective characteristic that is a fair proxy for dangerousness.").

Importantly, as *Rahimi* instructs, because Stennerson brings a facial challenge the Court must look at the circumstances under which the statute is "most likely to be constitutional," and as *Perez-Garcia* makes clear Stennerson, himself, need not have been disarmed, 96 F.4th at 1186.  But Stennerson's own circumstances include indictment for burglary, PSR ⁋ 11, which is clearly a serious offense under the *Perez-Garcia* analysis.

## CONCLUSION

For the foregoing reasons, the Court should affirm Stennerson's convictions.

15

DATED this 16th day of August, 2024.

Respectfully submitted,

JESSE LASLOVICH
United States Attorney

*/s/ Timothy A. Tatarka*

TIMOTHY A. TATARKA
Assistant United States
Attorney

## STATEMENT OF RELATED CASES

The government is not aware of any related cases.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, I certify that the attached answering brief is proportionately spaced, has a typeface of 14 points or more, and the body of the argument contains 2,984 words.

DATED: August 16, 2024          /s/ Timothy A. Tatarka
                                TIMOTHY A. TATARKA
                                Assistant United States
                                Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Timothy A. Tatarka*
TIMOTHY A. TATARKA
Assistant United States Attorney